MM-T

**DANNEZ W. HUNTER**
**FOR THE ESTATE OF ANNA S. HARRINGTON**
1275 Lincoln Ave., Ste #1
St. Paul, MN 55105
612-395-9111(F)

*IN PERSONA*

FILED

SEP X 4 2014

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DANNEZ W. HUNTER, an Individual, LARNELL EVANS, JR., an Individual FOR THE ESTATE OF ANNA SHORT HARRINGTON, an Individual (**"AUNT JEMIMA"**) PLAINTIFFS, vs. PEPSICO Inc., a Corporation, THE QUAKER OATS COMPANY, a Corporation, JANET LYNN SILVERBERG, an Individual PINNACLE FOODS GROUP, LLC, a Corporation, THE HILLSHIRE BRANDS COMPANY, a Corporation, and JOHN DOES 1 through 25, inclusive, DEFENDANTS. | Case No. **14-cv-6011** <br><br> 1. **RIGHT OF PUBLICITY** <br> 2. **BREACH OF CONTRACT** <br> 3. **FRAUD BY CONCEALMENT** <br> 4. **PROMISSORY FRAUD** <br> 5. **BREACH OF GOOD FAITH AND FAIR DEALINGS** <br> 6. **BREACH OF FIDUCIARY DUTY** <br> 7. **CONSPIRACY** <br> 8. **UNJUST ENRICHMENT** <br> 9. **ICERD** <br> 10. **CONVERSION** <br> 11. **ACCOUNTING** |
| | **DEMAND FOR A JURY TRIAL** |
| | (**"AMENDED COMPLAINT"**) |

Plaintiffs **Dannez W. Hunter,** and **Larnell Evans, Jr**. on behalf of the Class of 15 Great Grandchild of Anna S. Harrington, Actress, a.k.a. ("**Aunt Jemima**" 1935-1955) hereby brings forth this Class Action lawsuit alleging (collectively Plaintiffs') as follows:

### NATURE OF THE CLASS ACTION

1.      Plaintiff D.W.H, Great Grandson by and on behalf of the Class of Great Grandchildren of Anna S. Harington, Actress world re-known as **"Aunt Jemima"** brings forth this **"Right of Publicity," Breach of Contract," "Breach of Good Faith And Fair Dealing," "Breach of Fiduciary Duty," "Theft of Royalties," "Fraud,"** "Corporate Espionage" and willful **"Racial Discrimination Claim"** after defendants

1

received a "**Certified Death Certificate**" of Anna Short Harrington with Quaker Oat's name listed as the "**EMPLOYER**," as said co-conspirators refused to comply with instructions to "**Acknowledge**" her existence on their website in violation of ICERD Article 5(vi) against the Co-Conspirators **PepsiCo Inc.**, **The Quaker Oats Company, Pinnacle Foods Group, and John Does 1 through 25.** From October 28, 2013, up until present Defendants lied claiming they could not find any employment records or images of Anna S. Harrington's when in fact they knew they had her image deposited inside the USPTO while refusing to pay an **"equitable fair share of royalties**" and/or a percentage of gross proceeds for more 60 years. Plaintiffs assert and allege Defendants wrongfully procured in part and/or in whole the "**pancake mix formula**" including 64 original recipes created by Professional Chef Harrington and 22 menus. Defendants **thereafter advertised the theft after depositing a copy of Harrington's likeness inside the USPTO** without a consent in violation of 15 U.S.C. §1041(B).

2. Plaintiff asserts and alleges Defendants PepsiCo, Quaker Oats and Pinnacle willfully engaged in **Corporate Espionage** in violation of Harrington's **Rights To Publicity** including **The International Convention on the Elimination of All Forms of Racial Discrimination**" (**ICERD or CERD**) **Article 5(d)(vi)**. Defendants "**captured the likeness**" of Anna S. Harrington in company logos deposited inside USPTO and "**publicizing her image**" ("emphasis added") **throughout commerce** all over America, and internationally for the promotion of Aunt Jemima Product lines distributed via PepsiCo, Quaker Oats, and Pinnacle Foods under the trademark "Aunt Jemima" trademark in 1937. (Exh. 1, 44, **46**, 47, 49, 50)



**Reg. No. 71385940**
**Great Grandma Anna Short Harrington**



**Reg. No. 1697862**
**Grandma Olivia Hunter**

*"(EXPIRED) IC 030. US 046. G & S: GRITS, WHITE AND YELLOW CORNMEAL, READY-MIX BUCKWHEAT, [CORN AND] WHEAT FLOUR, AND READY-MIX PANCAKE FLOUR. FIRST USE: 19170711. USED IN ANOTHER FORM THE WORDS "AUNT JEMIMA" HAVE BEEN CONTINUOUSLY USED BY THE APPLICANT AND ITS PREDECESSORS IN BUSINESS SINCE NOVEMBER 27,1889. FIRST USE IN COMMERCE: 19170711"*

> **"Mrs. Short taught all the girls how to cook by the time they were seven or eight years old. All the girls' cooking was tasty and delicious, but there was something special about Anna's cooking that was "Distinctively" different."**

(Emphasis added) *The Story of Aunt Jemima, by John Troy McQueen*

3.     On April 16, 2014, Plaintiffs asserts and alleges that Senior Legal Counsel Dean Panos, for PepsiCo, Quaker Oats, and Pinnacle disclosed to Plaintiff's Attorney that Quaker Oats could not find "**any of the contracts**" for any of the women that migrated from "Plantations" where the Defendants exploited their images for the use of logos, and trademarks for the usage of their likeness to be portrayed as the actress "Aunt Jemima."   The Plaintiffs asserts and alleges Defendants befriended the Plaintiff's Grandmother Harrington, in order that the Perpetrators could wrongfully procure the **ingredients to the pancake formula**, and thereafter carried out willful acts of omission of Anna S. Harrington from their website. There are several citations online citing a life-long contract prior to Nancy Green's murder, as all actors under SAG are required to have contracts before appearing on TV.

4.     "In Aunt Jemima, it still possesses one of the most recognizable and thus valuable trademarks in history. (pg.151) By the 1960s the Quaker Oats Company was the market leader in the frozen food business, and Aunt Jemima was an American icon. Aunt Jemima is a world re-known Brand that is iconic. Defendants actions epitomize what is the worst in corporate America, exemplifying the worst business practices anywhere on the planet. "As a trademark, Aunt Jemima has been a familiar part of American culture and has been woven into the mainstream of the American advertising industry.

### Encyclopedia Aunt Jemima

**"The woman whose likeness was painted for the logo was Anna Short Harrington." http://www.statemaster.com/encyclopedia/Aunt-Jemima**

5.      Class Plaintiffs assert and allege Defendant Quaker Oats advertised and publicized throughout the universe: "**A way had to be found to mix by machinery the ingredients of Aunt Jemima's pancake batter, to mix them exactly according to "HER" (emphasis added) Recipe!** Equipment had to be built; it couldn't be bought. No one had ever made such pancake flour before. At last the way was found. The ad also mentioned that it was "**Aunt Jemima's idea,**" to add the "**dried milk**" (emphasis added) to the flour mix, **NOT R.T. Davis's**.' (pg. 66)

"Finally, under the mammy's supervision the northern mill's pancakes and Aunt Jemima's originals were taste-tested side-by-side, and "no one could see or taste a difference between them." (pg. 66, Slave in a Box)

6.      Harrington Estate Plaintiffs assert and allege Defendants Quaker Oats agreed to make payments to Anna S. Harrington as revenue was generated from "Aunt Jemima" pancake mix, and merchandise. Despite this on-going obligation, Defendants adopted a callous and reckless indifferent mentality to horde revenue while failing to pay the Estate of Anna S. Harrington after her death, and advertising on PepsiCo's website to deal "Fairly and Honestly with our associations regarding wages, benefits and other conditions of employment:----

### Human Rights Workplace Policy

PepsiCo respects the dignity of our workers in the workplace and we work to ensure our associates' rights to personal security, a safe, clean and healthful workplace, and freedom from harassment or abuse of any kind.

We deal fairly and honestly with our associates regarding wages, benefits and other conditions of employment, and recognize our associates' right to freedom of association. We do not use compulsory or child labor.

We do not tolerate discrimination and work to ensure equal opportunity for all associates.

We comply with all applicable laws, regulations and other employment standards wherever we operate or work.

We encourage our partners, suppliers, contractors and vendors to support these policies, and we place substantial value on working with others who share our commitment to human rights.

7.     On October 28, 2013, Plaintiff Great Grandson W. Hunter contacted the President of Quaker Oats to inform him that the Great Granddaughter of Anna S. Harrington needed a surgery to save her life, and to relinquish the contracts of Anna. S. Harrington along with **"royalty payments"**. Said Defendants utilized the employment services of Anna Harrington for the usage of her likeness to portray the real life role as the Actress Aunt Jemima. Plaintiff D.W.H  sought to acquire past royalties so that he could pay for his sister's life-saving surgery.

8.     Plaintiff D.W.H. asserts and alleges once Defendant Mr. Luis Prado, President of Quaker Oats was contacted the Executives within the corporation didn't care if the great granddaughter died and failed to appropriately respond to the inquire, or relinquish any of the contracts and has shown a **"callous"** and **"reckless disregard"** towards paying royalties in order to save the life of Anna S. Harrington granddaughter due to unbridled  "greed" and discrimination based on race while hoarding royalties. Plaintiff asserts and alleges that PepsiCo made more than $62 billion in the last 10 years, from 22 product lines not including prior years without paying one dime to the estate of Anna S. Harrington.

9.     Anna Short Harrington was born in 1897 in Marlboro County, South Carolina in a community known as Wallace where the seat of the county is Bennettsville. The Short Family lived on the "Peguese Plantation" where they picked cotton and worked in tobacco as sharecroppers.  In 1927, "A White family in Nedrow brought (Anna) from South Carolina as a maid. The lady promised her that they would **"take her"** ("emphasis added") back to South Carolina for her children. In 1928, they drove south and returned with Anna Harrington's five children.

10.     Anna Short Harrington left the south and found domestic work inside of Kappa Sigma fraternity house, as well as, working for wealthy people, including the New York Governor Thomas E. Dewey; in order, to support her 5 children. Ms. Harrington had three daughters and two sons, as she moved with her family to Syracuse, New York where she cooked for a living.

11. The Plaintiff's assert and allege in 1935, The Quaker Oats Company went to the state fair and discovered Grandmother Anna S. Harrington cooking pancakes for large crowds of people. On information and belief, Plaintiff Grandson asserts Quaker Oats Executives stood outside the restaurant trying to figure out "**How Can "We" Put This Into A Box**" and "Exploit" the **Black Women**. Plaintiff Great Grandson D.W.H. asserts and alleges, in November 1935, his Great Grandmother became the Actress to play the role of Aunt Jemima, whose likeness appeared in an ad in "**Women's Home Companion**". The Plaintiff asserts that Quaker Oats exploited "Aunt Jemima" persona to endorse products with intent to not pay royalties towards her estate after her death in violations of the Lanham Act, 15 1125(a), and constitutes state and common law, breach of contract and tortious interference with contractual relations.

12. Plaintiff D.W.H. asserts Quaker Oats deliberately failed to make sure his Grandmother had proper representation of a "Licensed Attorney" to review any and all verbal or written Contracts. The headline capitalized on her Southern "accent" and "dialect" which came from the Culture and Language of the Gullah-Geechee Blacks of South Carolina. The Plaintiffs asserts and allege that Defendant Quaker Oats entered into "Verbal and/or Written Contract(s) that were designed to exploit the Grandmother Anna S. Harrington in the future by praying upon her lack of "Education, Age, Race and access to Legal Counsel". In addition, upon the founding of the United States, White people were allotted land, of which is the foundation of wealth development. Defendants were in position to exploit Nancy Green, and Anna Harrington, that came from plantations because the United States Congress schemed to not pay reparations or honor promises of 40 acres and a mule.

13. In 1935, The Plaintiffs asserts and alleges the ad in "Woman's Home Companion" in November 1935 said, **"Let ol Auntie sing in yo' kitchen."** It was her picture with a **"Red"** ("emphasis added") bandana used on Quaker Oats products. "The headline capitalized on her Southern accent and dialect. "Make meal-time an adventure with Aunt Jemima's "magic menu" (emphasis added") "n" waffles, Southern style." Many people mistakenly believe the "Red" bandana to be solely from the Antebellum

southern attire from slave roots; however, those colors, style and dress go further back historically to a proud Gallah Nation all the way to West Coast of Africa that was later adopted by Whites as the image of Aunt Jemima. Many people from the "**Gallah Nation**" maintained the culture, as well as, unique "**cooking traditions". (Emphasis added**) From 1935 through 1955 Grandmother Harrington was the actress in commercials and public appearances playing the role of Aunt Jemima for 15 years, using her own Pancake Mix formulas as an employee of Quaker Oats. Anna S. Harrington died in 1955 and is buried at Oat Wood Cemetery, directly in front of Syracuse University.

"Some of her employers were a "**string of Governors of Virginia**" ("emphasis added"), Governor Thomas E. Dewey of New York, and a Fraternity House at Syracuse University." Working for the "**rich and famous**" prepared her for the events that was about to take place and ensure her niche in history. (*The Story of Aunt Jemima by John Troy McQueen, pg. 31*

14.    Plaintiff asserts and alleges Anna S. Harrington, received numerous cooking awards and trophies at state fair events for her "cooking skills," as defendants exploited her likeness for commercial use as well as the Grandma Olivia Hunter by conveying her essence and likeness of an individual products for  commercial use.

"Anna Short Harrington's fame was launched at a Fairground in Syracuse, New York area in 1935. She was cooking pancakes there when she was discovered by the Quaker Oats Company – her picture drawn, and her image publicized all over America as "**Aunt Jemima.**"

## INITIATION TO BAN QUAKER OATS PRODUCTS IN EMERGING AFRICAN MARKETS IN ADDITION TO LAND ACQUISITION DEALS DUE TO UNFAIR TRADE PRACTICES

15.    According to Port of Charleston records, African slaves brought to the port came from the following areas: Angola (39%), Senegambia (20%), the Windward Coast (17%), the Gold Coast (13%), Sierra Leone (6%), and Madagascar, Mozambique, and the two Bights (5% combined) (Pollitzer, 1999:43) Taken from the Western region of Africa in primarily the Krio and Mende populations of what is today Sierra Leone as

slaves and transported to some areas of <u>Brazil</u> (including Bahia), the Gullah-Gheechee slaves were sold to slave owners in what was then Charlestown, South Carolina. According to British historia, P.E.H. Hair, Gullah culture was formed as a creole culture in the colonies and United States from elements of, many different African cultures that came together there. These included the Wolof, Mandinka, Fula, Baga, Susu, Limba, Temne, Mende, Vai, Kissi, Kpelle, etc. of the Rice Coast, and many from the Gold Coast, Calabar, Congo Republic, and Angola. http://en.wikipedia.org/wiki/Gullah

"Mufwene says that after the Second World War there were several migrations out of the region towards cities like **New York** and Washington in search of jobs."



http://www.cnn.com/2012/12/07/world/africa/gullah-geechee-africa-slavery-america/

16. Grandmother Harrington having left the South was able to take the proceeds from her employment with Quaker Oats and buy a 22 bedroom mansion in the heart of Syracuse, but the property was taken over to make way for the freeway, thus Harrington lost her home due to development.

"A way had to be found to mix by machinery the ingredient's of Aunt Jemima's pancake batter, to mix them exactly according to **"HER" (emphasis added) Recipe!** Equipment had to be built; it couldn't be bought. No one had ever made such pancake flour before. At last the way was found. **The "ad" also mentioned that it was "Aunt Jemima's idea/formula ("emphasis added") to add the "dried milk" (emphasis added) to the flour mix, not R.T. Davis's.'**

17.    Class Plaintiffs asserts and alleged throughout the 1930s the bulk of Aunt Jemima advertising continued to concentrate on the romantic world of "plantation flavor" – a phrase ubiquitous in newspaper and magazine ads – on Aunt Jemima and reminders that the recipe was "Aunt Jemima's own," (emphasis added) featuring illustrations of Uncle Mose and Colonel Higbee. (pg. 146, Slave In A Box)

18.    "She was portrayed by a **"real life cook"** Anna Short Harrington (1900 - 1955) who worked for the Kappa Sigma Fraternity in Syracuse before going to work for former Governor Thomas E Dewey. "Harrington Appeared on local New York television programs and commercial during the early 1950s". http://books.google.com/books?id=tDYftTBTFyEC&pg=PA28&lpg=PA28&dq=anna+robinson,+aunt+jemima,+died+1951&source=bl&ots=eW0BhHcCc3&sig=8C_wKXNFGYc149rifYdLygPqCww&hl=en&sa=X&ei=jBs1U6yoOOGdyQH5h4G4BA&ved=0CD8Q6AEwBA#v=onepage&q=anna%20robinson%2C%20aunt%20jemima%2C%20died%201951&f=false



ANNA SHORT HARRINGTON
(1897-1955)

1  **"The woman whose likeness was painted for the logo was Anna Short Harrington."**
2  **http://www.netipedia.com/index.php/Aunt_Jemima**

3      19.    Plaintiff D.W.H. asserts and alleges Quaker Oats then kept it **"All in the**
4  **Family"** and hired three of Anna S. Harrington's Daughters out of the five children to
5  play the role of Aunt Jemima. The second family member to be utilized the play the
6  Actress of Aunt Jemima was Deloris Hoffman, who died in her restaurant from a heart
7  attack at the tender age of 40. The third family member to play the role of Aunt Jemima
8  was Laura Mae Patterson.

9      20.    Around or about 1989, Plaintiffs' asserts and allege at some stage,
10  Executives from Quaker Oats contacted Grandmother Olivia Hunter, the youngest
11  Daughter of Anna Harrington and posed inquire about the "Red" Bandana. The issue
12  about the red bandana had become a political charged hot button issue, with many people
13  not understanding the historical roots of the Galluh Nation.

14      21.    Plaintiffs' L. E. Sr., asserts and alleges that PepsiCo, and Quaker Oats
15  Executives sent a photo opt team to the house to capture a picture of Olivia Hunter
16  whereby they used her likeness, "hair color," hair line, style ("emphasis added") and
17  then "removed" the "Red" Bandana, and placed her image on the box.



**Laura Mae Sizemore**

Laura Mae Sizemore, 74, of 300 Burt. St., Syracuse, died Saturday after a long illness.

Mrs. Sizemore was born in Raleigh, N.C.

She was one of five children of Anna S. Harrington, who was the representative for the Quaker Oats Company for more than 15 years as "Aunt Jemima." She and her late sister Dolores also appeared in commercials as representatives.

Mrs. Sizemore worked as a cook at the Kappa Sigma, Phi Sigma Delta and Sigma Alpha Mu houses at Syracuse University.

Surviving are a brother, Levi Harrington of Sanford, Fla.; an aunt, Lila Davis of Rockingham, N.C.; two nieces, Elizabeth Hunter and Louise Solomon, both of Syracuse; several great- and great-great nieces and nephews; and her companion, Joseph Edmon.

Services are 1 p.m. Thursday at the Edwin L. Cole Funeral home, 2104 S. Salina St. Calling hours are 2 to 4 and 7 to 9 p.m. Wednesday at the funeral home.

Burial will be in Oakwood Cemetery.

Repast will be at 346 Furman St.

"As a child in the 1950s I could not look inside the image and see the African bones under those high cheeks. It was simply a "bandana" on "her head" not the American adaptation of the West African "**Gele head wrap**". ("Emphasis added") (Gomez, 1986, pp. 14–15) http://testaae.greenwood.com/doc_print.aspx?fileID=GR5184&chapterID=GR5184-561&path=books/greenwood, (Exhs. 44, 45, 46, 47, 48, 49, 50)

## PARTIES

22.     Plaintiff **Dannez W. Hunter** is the Great Grandson of Anna S. Harrington located at 1275 Lincoln Ave. , Ste #1, St. Paul, MN 55105

23.     Plaintiff **Larnell Evans, Jr.** is the Great Grandson of Anna S. Harrington located at 604 Smokehouse Ln., Albermarle, NC 28001.

24.     On information and belief, Defendant **PepsiCo, Inc**. is located at 700 Anderson Hill Road Purchase, NY 10577 and with a Chicago offices located at 555 West Monroe Street, Chicago, IL 60661, (Ph): (914) 253-2000, Fax Number: (914) 253-2070. PepsiCo Inc. register of Agents is **c/o CT Corporation System, 208 S. LaSalle St. Ste #814, Chicago, IL 60604 to be served with the civil complaint. Its** revenues support this claim. In just one fiscal year (2013), PepsiCo. and all its brands made $65 billion dollars. Its principal place of business is New York.

24.5     **Janet Lynn Silverberg** is the Chief Trademark Attorney that works at PepsiCo, Inc. 555 W. Monroe St., Suite 11-10, Chicago, IL 60661-3605.

25.     On information and belief, Defendants The **Quaker Oats Company is** a "Corporation" located at 555 W Monroe St Fl.#1 Chicago, Illinois 60661-3716 United States. Defendant Quaker Oats Register of Agents is c/o **CT Corporation System, 208 So. LaSalle St. Suite 814, Chicago, IL 60604** to be served with the civil complaint.

26.     On information and belief, Defendant **Pinnacle Foods Group, LLC, c/o Agent: C T Corporation System** is located at C T CORPORATION SYSTEM, 208 SO. LaSalle St, Ste. # 814, Chicago, IL 60604, and a Principal place of business 99 Jefferson Road, Parsippany, NJ 07054.

27.     On information and belief, Defendant **The Hillshire Brands Company, c/o Agent: C T Corporation System** is located at 208 SO LASALLE ST, SUITE 814 Chicago, IL 60604, Secretary: Kent B. Magill 400 S Jefferson St. Chicago, IL 60607.

Defendants just merged with Pinnacle's with a closing market cap price for the total enterprise value of $6.6 billion.

28.     John Does 1 through 25 are fictitious names of defendants sued under the provision of Section 474 of California Code of Civil Procedure because their true names and capacities, whether individual, association, partnership, corporation or otherwise, are unknown to Plaintiffs at this time. Plaintiffs will seek leave of court to amend this Complaint to allege the true names and capacities of said defendants when they are ascertained.

29.     Plaintiffs are informed and believe, and on the basis allege, that at all times relevant hereto, the defendants, and each of them, were acting on behalf of an as the employee, agent, and/or representative of each other and with the consent, knowledge and permission of each other and with the consent, knowledge and permission of each of the remaining defendants, and were acting within the course, scope and purpose of said employment, agency, authority and/or representation.

30.     Plaintiffs also are informed and believe, and on that basis allege, that all defendants sued herein as Does, and each of them, acted in consort, participated in and aided and abetted in the acts alleged herein, or are in some manner responsible for the acts alleged herein. Plaintiffs further are informed and believe, and on that basis allege, that some or all of the acts and omission alleged herein and some or all of the damages sustained by Plaintiffs occurred within this judicial district of Minnesota, Chicago, New York, and Atlanta.

31.     The Quaker Oats Company, and PepsiCo and Does 1 through 25 are collectively referred to herein as "Defendants.

## JURISDICTION & VENUE

32.     This Court has subject matter jurisdiction over the claims pursuant to 28 U.S.C. 1331, 1332(a) and (d) including 28 USC 1338(a) (any act of Congress relating to copyrights, patents and trademarks) for the Class exceeds $5,000,000, and the Plaintiff and other putative Class members are citizens of a different state than Defendant.

33.     The Court also has subject matter jurisdiction over the remaining claims under the doctrines of ancillary and pendent jurisdiction. The amount in controversy exceeds $5,000,000 dollars, exclusive of interest and taxes.

34.     This Court has personal jurisdiction is proper over Defendants because D.W.H. submits to the Court's jurisdiction. The Court has personal jurisdiction over the Defendants because they regularly do business in Minnesota, Chicago, and New York, where their headquarters are located in one or other judicial district and/or directed tortious conduct throughout the named states and/or judicial district.

35.     Venue is proper in this judicial district pursuant to 42 U.S.C. § 1391(b) and (c) because a substantial part of the events or omissions giving rise to the claims occurred here, a substantial part of the subject property is located in Chicago, New York, and Minnesota, as conduct has been directed into this district, and the harm to Anna Harrington's' family occurred in this district including Atlanta.

36.     This action also alleges a claim under the Minnesota Human Rights Act ("MHRA"), Minn. Stat. §363.01 *et seq.* and Lanham Act §38. The Court has supplemental jurisdiction over this claim under 28 U.S.C. § 1367.

## INTRADISTRICT ASSIGNMENT

37.     Intra-district assignment to any division of the Northern District is proper under the Local Rule 3-2(C) and the Assignment Plain of this Court as an Intellectual Property Action.

## JURY DEMAND

38.     Pursuant to the Seventh Amendment to the United States Constitution, ICERD, and Fed. R.Civ.P. 38 and 39, plaintiffs request and/or demand trial by jury with respect to all issues triable and/or triable as of right by jury.

## WEST AFRICAN JURISDICTIONAL DUAL ASSIGNMENT
## CONCERNING GALLAH/GEECHE NATION

39.     Subject matter jurisdiction shall hereby also rest within the Western African Nations from Sierra Leone, Ghana, and Angola, Zimbabwe etc. to implement any and all

equitable remedies towards PepsiCo, and Quaker Oats that are found to have engaged in "Uneven/Unfair Businesses Practices".

## STATUTES OF LIMITATION

40. On March 31, 2013, Plaintiffs assert and allege that Dean Panos Attorney For PepsiCo, Quaker Oats and Pinnacle disclosed that said parties could not locate and/or or find any contracts for any of the Aunt Jemimas' including Anna S. Harrington's likeness that is deposited within the USPTO; in order, to be in compliance with 15 U.S.C. 1041(B), of which invoked the Harrington Estate's Ownership in the Aunt Jemima trademark, while calling into question a "**THEFT**" of 64 original formulas and 22 menus. Statute of limitations begins to run upon the discovery of a theft. From **Nov. 1, 2013** until June 2014, statutes of repose are **tolled** as a proximate result of Supervisors within Syracuse Vital Statistics deliberately engaging in **fraud** and "**reversing**" an "**electronic payment**" transaction **No. #219450639874**, in the amount: $45.00 dollars while making false statements with calculated intent to "interpose delay" and obstruct receipt of the Certified Death Certificate for approximately 6, thus invoking tolling for the third incident of **Economic Espionage** within a 10 year period by a government employee against members of the Black community. Statutes of limitations do not apply to African American's that were taken from plantations as they were not compensated by the U.S. Government for Reparations and could only depart with their only possession which was in this case 64 formulas and 22 menus. (Exh. **21, 22,** 46)

41. Plaintiff asserts and alleges, Statutes of Limitations under ICERD have four years from the date of the discriminatory act to file the lawsuit. http://www.employmentlawfirms.com/resources/employment/discrimination/what-is-statute-limitations-for-filing-race-discrimination (Exhs. 49, 50)

42. On August 25, 2014, the USPTO released the Aunt Jemima Trademark Application No 71/385,940 where the fraudulent statement deposited therein was not known prior by the Plaintiffs. In addition, the Supreme Court held that the filing of a class action suspends the statute of limitations as to all "putative class" members so long as they remain members of the proposed class. Plaintiff further asserts statutes of

limitations and statutes of repose toll on Babe Jane Doe as she is unaware of the breach, and Congress did not intend of such statutes to be a bar for Federal Trademarks or Copyrights.

## FACTS COMMON TO ALL CAUSES OF ACTION

43.    Aunt Jemima pancake mix is an iconic brand that became an American famous household product that is known throughout the world for breakfast. Plaintiffs' assert and alleges that in 1889 Christ Rutt and Charles Underwood of Pearl Milling Company produced a self-rising pan cake mix ready mix under the brand of Aunt Jemima. In 1890, RT Davis purchased the struggling Aunt Jemima Manufacturing Company. He then brought to life the Aunt Jemima character Nancy Green as his spokeswomen.

44.    Plaintiffs' asserts and alleges "the founders immediately began to package the mix for sale to the public. The first commercial batch was packaged in paper bags with a generic label, **"Self-Rising Pancake Flour**," since the Aunt Jemima name had not yet been conceived."

45.    Plaintiffs assert and allege "Rutt and Underwood could not raise the necessary capital to promote and market the product effectively. They soon ran out of money." in 1900, the company suffered one disaster after another. It declared bankruptcy and was reorganized in 1903 and renamed the Aunt Jemima Mills Company in 1914.

46.    Plaintiffs assert and allege Davis Company risked an expensive promotion and took a booth at Chicago's Columbian Exposition and World's Fair in 1893. They gambled the entire company on acquiring a figure head to portray Aunt Jemima. The response was nearly overwhelming; a police detail was required, and Davis' gamble paid handsomely."

47.    In 1914, the image of Aunt Jemima was so popular that the company renamed the company the Aunt Jemima Mills Company. In 1926, The Quaker Oats Company purchased the Aunt Jemima Mills Company.

48.    Around or about 1933 John Does Executives at Quaker Oats advertising division hired Anna Robinson, described as a large, gregarious woman with a face of an angel. Ms. Robinson died in 1951.

49.    Plaintiff asserts and alleges around or about 1935, Advertising Executives within Quaker Oats discovered Grandmother Anna S. Harrington at the "**Syracuse State Fair**" cooking "**her own pan cake mix**" **("emphasis added")** and then approached her to portray the Actress roll of Aunt Jemima where thereafter she become employed for 15 years.



## CORPORATE ESPIONAGE

50.    The Plaintiffs asserts and alleges the "A coupon offered (with one box) "Aunt Jemima's "album of Secret Recipes" (emphasis added) **containing 64 of her recipes and 22 complete menus**." ("Emphasis added") (*The Story of Aunt Jemima by John Troy McQueen, pg. 36*)

51.    The Plaintiffs asserts and alleges "**Professional Chef & Nutritionist**" "**Mrs. Harrington developed her own recipe for keeping for keeping her waistline down and the pancake consumption up. She used potato grease on the skillet instead of butter. "That was probably the first time in history that potatoes weren't considered fattening.**" (*The Story of Aunt Jemima by John Troy McQueen, pg. 36 and 37*)

52.    In 1937, the Plaintiff asserts and alleges The Quaker Oats company trademark the character Aunt Jemima.





53.

UNITED STATES PATENT OFFICE

AUNT JEMIMA

STATEMENT

54.    In 1957, Defendants Quaker introduced Aunt Jemima "Buttermilk" ("emphasis added") Pancake & Waffle Mix. Also at this time, Quaker began to advertise on television, and also making "Aunt Jemimas".





55.    In 1966, Plaintiff asserts and alleges Quaker introduced syrup under the Aunt Jemima trademark.

56.    In 1968, Plaintiff asserts and alleges Quaker introduced Aunt Jemima frozen waffles.

57.    In 1970, Quaker introduced Aunt Jemima Lite Syrup.

58.    In 1981, Quaker introduced a campaign for frozen products.

59.    In 1985 Quaker introduced Aunt Jemima Butter Lite syrup.

60.    In 1991, Quaker Oats introduced Aunt Jemima Butter Rich syrup.

61. In 1996, Aunt Jemima frozen products were licensed out to Pinnacle Foods Corporation. http://www.ajcornmeal.com/aj_history/

62. In addition, revenue was generated from licenses to third parties such as Pinnacle Food, as Defendants sold "Aunt Jemima" related merchandise through various wholesalers, stores, shops to help market and sell "Aunt Jemima" drinking mugs, and other related products.

63. The backdrop to the "trademark" image of Aunt Jemima wearing the "Red" bandana is a romanticized view of antebellum plantation life that was captured in photos based upon Anna S. Harrington's likeness in 1935. The myth surrounding Aunt Jemima's secret recipe, family life, and plantation life as a happy slave contributes to the post-civil war idealism of southern life and America's developing consumer culture.

## UNLAWFUL CONDUCT OF COMMON TO THE CLASS DEFENDANTS
## FAILURE TO PROVIDE REVENUE REPORTS

64. Defendants shaped and ultimately controlled the reasonable expectations of Anna S. Harrington. In addition to providing the benefits of collective bargaining for its members, the Screen Actors Guild ("SAG") monitors television residuals. SAG does not monitor merchandising.

65. Defendants had exclusive control of the financial information necessary to determine whether Plaintiffs were owed money related to merchandise. Plaintiff does not have access to this information.

66. It is the customary practice in the entertainment industry to provide periodic revenue statements when revenue had been generated relating to merchandise. Anna S. Harrington was not aware of this custom and practice and relied upon Defendants to provide revenue statements if funds were due to Harrington.

67. Defendants knew that without the revenue statements Anna S. Harrington and her family would reasonably believe that they were not owed any money relating to merchandise. Capitalizing on this knowledge, Defendants did not provide Anna S. Harrington with revenue statements, and as a consequence, Plaintiffs family formed the reasonable belief that Defendants did not owe them any money.

68.     Around or about October 28, 2013, Plaintiff Great Grandson contacted Quaker Oats and demanded that they pay a fair share of royalties and justifiable compensation for their Grandmother Anna S. Harrington playing to Actress Aunt Jemima for 15 years, and the Defendants failed to respond to the billion dollar "request".

69.     Plaintiffs D.W.H. did not and could not have reasonably discovered facts constituting Defendants breach of contract, fraud and conversion of monies until Plaintiff learned in mid-October 2013 that they trademarked the likeness, and picture of Anna S. Harrington wearing the Red bandana in 1937. Plaintiff had been diligently looking for this crucial information for years to no avail, until a Jane Doe person was on a phone call that discovered the link online to Wikipedia in October 2013.

70.     Plaintiffs asserts and alleges that his Great Grandmother Anna Harrington entered into a written contractual agreement with Quaker Oats to do guest appearances and commercials for 15 years while using her **"own original pancake mix"** and to share in the gross proceeds and/or royalties of any and all Aunt Jemima products over the duration of 15 years.

71.     Plaintiff assert Quaker Oats did not teach Anna S. Harrington, Deloris Hoffman or Laura Mae Patterson how to make the secret formula to the pancakes, as The Harrington's already knew and Anna had her own formula/traditions when they discovered her cooking at the state fair for massive crowds of people.

72.     Plaintiff asserts and alleges that his Uncle / Witness William Scott when he was less than 10 years was the local Paper Boy riding a bicycle around town and delivering papers in the community. According to Witness William Scott he would go to the fair grounds and eat Pan Cakes directly made by Anna S. Harrington before he knew that he would marry the Plaintiff's Aunt D. Scott.

73.     On information and belief Plaintiff asserts that Anna Harrington entered into a written contractual agreement to play the Actress role of Aunt Jemima to acquire percentage of net and/or gross proceeds, including but not limited to a royalty rate after immortalizing her image inside the USPTO throughout world commerce in advertisement and/or for various products.

74. The Plaintiffs asserts Anna Harrington conferred a benefit on the defendant Quaker Oats. The defendants Quaker Oats and PepsiCo had knowledge of the benefit. Said defendants accepted or retained the benefit of Anna Harrington working for 15 years as the Actress of Aunt Jemima, and circumstances make it unjust for the Defendants to retain the benefit without justifiable compensation to her estate of Anna S. Harrington and her family heirs.

75. Plaintiffs asserts and alleges that Anna S. Harrington travelled from State to State on the trains, visiting various cities working for Quaker Oats as the Actress Aunt Jemima while making her own "**formula for pancakes**" under the mutual understanding that Quaker Oats would share in the proceeds of the business.

76. Plaintiffs assert Pinnacle Foods have been selling around $300,000,000 million dollars in Aunt Jemima product lines without paying any royalties to the Estate of Anna Short Harrington.

77. Plaintiff asserts that defendants Quaker Oats committed a material breach resulting in damages based on failure to fully compensate her estate annually after her death while engaging in "**Industrial Espionage**" and wrongfully procuring in part and/or in whole trade secrets from Anna S. Harrington's "pancake formula". Plaintiff's asserts and allege Defendants took out an Ad in newspapers boasting about procuring the trade secrets of the formula while engaging in willful acts of deception. ("Emphasis added").



8. "Aunt Jemima Bids Goodbye to the Old Plantation." *Saturday Evening Post*, 15 January 1921, 90.

78.     Plaintiff asserts and alleges Defendants PepsiCo, Pinnacle, and Quaker Oats Attorney Dean Panos claimed the Defendants cannot find any contracts authorizing them to use any of the likenesses of Anna Short Harrington, Olivia Hunter, Deloris Hoffman, and anyone else that portrayed the Professional Chef Aunt Jemima. Plaintiff  D.W.H. asserts and alleges to wit defendants willfully procured by deceptive means in part and/or in whole elements of Anna S. Harrington's **"Pancake formula,"** and then developed **"selective amnesia"** with malice intent to procure 64 formulas and 22 menus. Plaintiff continued to pose inquire to PepsiCo, Quaker Oats, and Pinnacle Board of Directors specifically inquiring to know, "What make you think your **"ENTITLED"** to utilize our Great Grandmother's likeness "without payment" as your entities do not own the Trademark Aunt Jemima?"

From: DPanos@jenner.com
To                                                    marc.kesselman@pepsico.com
Subject: RE: Estate of Anna S Harrington
Date: Mon, 31 Mar 2014 23:02:35 +0000

Dear Mr. Hunter,

We apologize for any delays in responding sooner.  PepsiCo and Quaker are actively searching for contracts that would pertain to Ms. Anna S. Harrington, which if they exist go back 60 years or even longer.  We thus far have not located these documents in the places that have been searched.

Please have Mr. ████ let me know if this is acceptable to you.

Regards,

Dean"

79.     According to the newspaper article from Oakwood Cemetery around 2001, Plaintiff asserts and alleges that Quaker Oats omitted Anna S. Harrington from their

website with premeditated intent to not pay a fair and equitable share of the revenues or royalties to the estate while exploiting the Harrington's likens for commercial purposes.

80.     In the alternative Plaintiffs assert and alleges that defendants Quaker Oats procured a quasi-contract for services from Anna S. Harrington to play the Actress of Anna S. Harrington in commercials and public appearances while preparing "HER OWN" Original Formula at the state fair grounds for pancake mix as the defendants plotted on the side, with intent to wrongfully procure the Pancake Mix formula without just compensation. Defendants schemed to get next to the Governor Dewey's Chef and knowingly accepted Harrington's services, retained the resulting proceeds, and it would be inequitable for PepsiCo or Quaker Oats to continue to retain all the benefits without justifiable compensation to her estate.

 

81.     On October 28, 2013, Plaintiff asserts and alleges that he contacted Quaker Oats to relinquish the contracts for employment up to 15 years. Shortly thereafter, Plaintiff's Aunt Betty Williams passed away.  Plaintiff went online to "Ancestory.com" digging for information on Anna. S. Harrington and found the actual gravesite of Anna. S. Harrington buried at Oakwood Cemetery located at Plot: Sect H-4, plot #63.

82.     Plaintiff asserts he went to Syracuse for the funeral and searching for his Great Grandmother's gravesite, and to specifically check to see if Quaker Oats left any

1  **flowers on the gravesite**, after not paying any royalties for 60 years. The Plaintiff
2  asserts due to over racism and utter "**CONTEMPT**" ("emphasis added") towards the
3  Black community Defendants PepsiCo and Quaker Oats did not leave one flower on the
4  gravesite while wrongfully procuring 64 original recipes and 22 complete menus
5  inclusive of the Pancake formula, thus constituting Corporate Espionage to a pancake
6  empire that grosses more than $300,000,000.00 million per year.

7      83.

 

15     84.    Plaintiff D.W.H. asserts and alleges that in September of 1993 his
16  Grandmother Olivia summoned him to Syracuse in her final stages of cancer and gave
17  him the picture of his Great Grandmother Anna S. Harrington, as the Actress Aunt
18  Jemima on his way to Japan as an International Student. Plaintiff did not want to lose the
19  picture, and made a copy of the image and asked his Grandmother to hold onto the
20  picture until he returned from Japan so that he could perform research on the history.
21  Plaintiff asserts that his Grandmother Olivia passed away while he was in Japan, and that
22  when he returned to Syracuse for the funeral to find the original picture, it was gone.

23     85.    Furthermore, Plaintiff Hunter asserts that in November 2013 he contacted
24  the Oakwood Cemetery to find the grave sites of his Great Grandma Anna Harrington,
25  and Aunt Deloris Hoffman. Oakwood Cemetery faxed documents concerning the family.

Grandmother Olivia Hunter was a Foster Mother for "Black and White children" that didn't have homes and raised nearly 30 kids within her lifetime in Syracuse and Florida.



86. Plaintiff D.W.H. asserts and alleges that PepsiCo, Quaker Oats, and Pinnacle are "**willfully engaged**" in a "**Pattern**" and "**Practice**" of racial discrimination towards Anna S. Harrington's heirs, including members within her family, reflecting an innate form of disrespect towards African American people in general as cited by *Glenda Brooks vs. Quaker Oats, Case No. 10-2135* filed June 28, 2010.

87. Plaintiff asserts and alleges that Quaker Oats contributed economic resources to "Rainbow Coalition" to not Boycott PepsiCo and Quaker Oats and after trademarking the character in 1937 of Anna S. Harrington to portray Aunt Jemima and to exploit her likeness, image, and picture over 15 year duration of time, including all her daughters. After her death, Defendants knew that they were engaging in oppression, fraud, or malice conduct by failing to pay any royalties, revenue, on the sale of goods, products, including merchandise for 59 years. (Exh. 49, 50)

88. Plaintiffs assert and allege Defendants Pinnacle Foods merged with Hillshire Brands around or about May 2014 in the tune of a $ 5 billion annually cash with a so-called mission "**Reinvigorate Iconic Brands**," such as Aunt Jemima. (Exh. 3)

"From: ████████████████ @gmail.com)

Sent: Mon 5/05/14 5:36 PM

To: ██████ Hunter (██████████ @hotmail.com)

"████████████████████████████████████████ the lawyer and I are still negotiating on **cordial terms**."

89.     Plaintiff asserts and alleges due to systemic and institutionalized discrimination based on **"Race", perpetrated by Defendants PepsiCo, Quaker Oats, and Pinnacle Foods Executives** said parties at the behest of their Attorney Dean Panos willfully engaged in acts of "omission," while refusing to comply with instructions to **"acknowledge the existence"** of Anna Short Harrington as Aunt Jemima on their historical website while utilizing her image on product brands. Plaintiff asserts and alleges Quaker Oats deposited Harrington's likeness inside the USPTO, and in **"bad faith,"** failed to pay royalties to the heirs for the usage of Harrington's likeness as a Federal Trademark after receipt of the **Certified Death Certificate** listing **Quaker Oats** as the **EMPLOYER**.

90.     Plaintiff asserts and alleges according to statements from the internet Defendants **paid third party non-families (i.e. The Rainbow Coalition) that resulted in a boycott against PepsiCo**, and **Quaker Oats** being averted, of which, imputes **GUILT**.

91.     Plaintiff asserts and alleges Defendant Executives, including Janet L. Silverberg PepsiCo, Chief Trademark Attorney in **"bad faith"** did not make any counter offer in ten months, while operating under the erroneous belief of **"White Privilege"** and **"Entitlement,"** with **callous intent** to steal royalties from Olivia Hunter who was a foster Grandmother for the City of Syracuse, literally taking care of 5 babies under 4 years old while terminally ill and dying from cancer, as PepsiCo, so - called Harvard Executives schemed to exploit and wrongfully procure past, present and future royalties for 64 original formulas and 22 menus. Defendants were aware of Olivia Hunter's diminished capacity as they schemed to acquire her photograph while encroaching upon her right to be compensated for the use of her image, as well as, inherit proceeds from

enslavement without Reparations from the United States in violations of **ICERD Article 5(vi)**:

>    Date: Tue, 24 Jun 2014 15:18:12 -0700
>    Subject: Aunt Jemima
>    From: ▓▓▓▓▓@gmail.com
>    To: ▓▓▓▓▓@yahoo.com; ▓▓▓▓▓@hotmail.com

D▓▓▓:

"I received a call this afternoon from Dean Panos…"

"Also, Mr. Panos is **unwilling to open the package you sent to him** ……….."

"**He still has the package but it remains unopened.** Regarding the death certificate, he assures me that he has no intention of altering it (as I have my own certified copy), but he cannot assure you that he will be able to do the special handling which you have requested. If you insist on special handling, he will return your package unopened."

Sincerely,

R▓▓▓



## **FIRST CAUSE OF ACTION**

### **(Deprivation of Rights of Publicity, Violation New York Sect. 50 and 51 *et. seq.*)**

### **(By Plaintiffs against All Defendants, and Does 1-25)**

92.     Plaintiffs' re-alleges each and every allegation contained in all prior paragraphs, against Defendants PepsiCo, Quaker Oats, Pinnacle, Hillshire Brands, and John Does of this Complaint for exploitive commercial purposes. (Exhs. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10)

93.     Plaintiffs asserts and alleges the Harrington Estate relinquished a copy of Anna Short Harrington's Certified Death Certificate with Quaker Oats on the Vital Statistic document listed as the employer, as the Co-conspirator Executive Defendants, refused to offer any payment for past royalties while simultaneously refusing to comply

with instructions to acknowledge Anna Harrington on the Quaker Oats website with discriminatory animus intent based on race.

94.     Plaintiffs as class members asserts that Defendants Quaker Oats deposited their Great Grandmother Anna Short Harrington, likeness and complete facial features inside the USPTO under registration number **Reg. No. 71385940** without a consent and/or release form. Plaintiff asserts and alleges that PepsiCo, Harvard Graduate Attorney Janet L. Silverberg, Chief Trademark Executive deposited our Grandmother Olivia Hunter's likeness, after a photo-opt, inside the USPTO which reflected her chin, cheeks, lips, hairline, hair texture, forehead, skin tone, eye color, ear rings, of which was distributed through interstate commerce in order to procurement of the Trademark 1697862 for the purposes of advertising, selling and soliciting purchases of pancake products, without disclosing to her while she had cancer that she was owed royalties. (Exhs. 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 23, 24)

95.     Defendants PepsiCo, Quaker Oats, and Pinnacle have willfully and intentionally used and continued to use entire family blood line likeness throughout world commerce inclusive of Anna Short Harrington, Deloris Hoffman, and Olivia Hunter while encroaching upon the Rights of Publicity by the heirs. Plaintiff asserts and alleges Pinnacle Foods annual revenue is $5 billion dollars with a so-called Mission to: "Reinvigorating Iconic Brands".http://www.glassdoor.com/Overview/Working-at-Pinnacle-Foods-EI_IE6882.11,25.htm

96.     Defendants undertook actions in the furtherance of their conspiracy to use in commerce the entire family likeness within all states of America, including Illinois, New York, Atlanta, North Carolina, etc. In addition, Defendants use of Great Grandma Anna Short Harrington, Aunt Deloris Hoffman, Aunt Laura Mae Sizemore, and Grandma Olivia Hunter images and likeness arose in and emanated from Syracuse New York.

97.     Plaintiffs' class as the Estate of Anna Short Harrington and Olivia Hunter has been injured.

## SECOND CAUSE OF ACTION

**(Deprivation of Rights of Publicity, Violation Illinois Law**

**(765 ILCS 1075/1))**

**Right of Publicity Act.**

**(By Plaintiffs against All Defendants, and Does 1-25)**

98.    Plaintiffs' re-alleges each and every allegation contained in all prior paragraphs, against Defendants PepsiCo, Quaker Oats, Pinnacle, Hillshire Brands, and John Does of this Complaint for exploitive commercial purposes.

99.    Defendants PepsiCo, Quaker Oats, and Pinnacle, has knowingly and intentionally utilized and continue to utilize the likenesses, of Great Grandmother Anna Short Harrington, Aunt Deloris Hoffman, Grandmother Olivia Hunter for the purpose of selling pancakes including 64 other original formulas created by Grandma Harrington without a consent form deposited inside the USPTO, with calculated intent to deprive the Harrington Estate and Class Plaintiffs of past and future royalties (Exhs. 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 23, 24)

100.    Plaintiffs asserts and alleges the Harrington Estate relinquished a copy of Anna Short Harrington's Certified Death Certificate with Quaker Oats on the Vital Statistic document listed as the employer, as the Co-conspirator Executive Defendants, refused to offer any payment for past royalties while simultaneously refusing to comply with instructions to acknowledge Anna Harrington on the Quaker Oats website with discriminatory animus intent based on race.

101.    PepsiCo, Quaker Oats, and Pinnacle, has used and continues to use the entire families likeness for the purpose of advertising, selling and soliciting the purchase of 64 original product lines including pancakes.  Most decisions and policy relating to this conduct has occurred in and emanated form Illinois specifically Quaker Oats.

102.    As a result PepsiCo, Quaker Oats, and Pinnacle misappropriation of the Harrington Estate publicity Rights, Plaintiff class members have been injured.

**THIRD CAUSE OF ACTION**

**(Violation of Rights of Publicity, Violation**

**Illinois & New York Common Law**

**(By Plaintiffs against All Defendants, and Does 1-25)**

103. Plaintiffs' re-alleges each and every allegation contained in all prior paragraphs, against Defendants PepsiCo, Quaker Oats, Pinnacle, Hillshire Brands, and John Does of this Complaint for exploitive commercial purposes.

104. Pursuant to their unlawful conspiracy, PepsiCo, Quaker Oats, and Pinnacle Foods continues to utilize the likeness Anna S. Harrington, Deloris Hoffman, and Olivia Hunter on Aunt Jemima Product lines without a consent deposited within the USPTO in violation of said rules. (Exhs. 48, 49, 50)

105. As a result of PepsiCo's, Quaker Oats, and Pinnacle Foods misappropriation of their public rights Plaintiffs class members have been injured.

## FOURTH CAUSE OF ACTION

### (Civil Conspiracy)

### (By Plaintiffs against All Defendants and Does 1-25)

106. Plaintiffs' re-alleges each and every allegation contained in all prior paragraphs, against Defendants PepsiCo, Quaker Oats, Pinnacle, Hillshire Brands, and John Does of this Complaint for exploitive commercial purposes.

107. Plaintiff asserts and alleges, Defendants, and each of them, have conspired and combined with each other, and possibly with third parties, to use the Harrington's likenesses without equitable compensation of royalties or proceeds, and have achieved a meeting of the minds, through either an "**express or tacit agreement,**" on an object or course of action in the furtherance of the conspiracy, including depriving Anna S. Harrington's class members of their right to be compensated from the Harrington's likeness and heirs rights to royalties and rights to publicity and their Great Grandmother's contractual, property rights in violation of ICERD or CERD.

108. Defendants have formed and operated a "**civil conspiracy**" with each other, performing as part of the conspiracy numerous deplorable overt acts in the furtherance of a common design, including one or more unlawful acts which were performed to accomplish a lawful or unlawful goal, or one or more lawful acts which were performed to accomplish an unlawful goal. (Exhs. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 15, 16)

109. As a result of the wanton and malice conduct of Defendants and the conspiracy, Plaintiffs Harrington Class Estate members have been damaged as described above and other legal and equitable relief for the courts deems just and proper pursuant to Lanham Act §38, 15 U.S.C.A. §1120, "Damage Recoverable for Wrongful Registrations of Trademark," and failure to pay for the use of 64 formulas.

110. As a direct and proximate result, Plaintiff asserts and alleges Defendants within PepsiCo, Quaker Oats, and Pinnacle owed Plaintiffs', and Plaintiffs are informed and believe, and thereon allege, that they have been damaged in the amount exceeding **Two Billion Dollars ($2,000,000,000.00)** together with interest thereon at the full legal rate pursuant to 765 ILCS 1075/5, and 765 ILCS 1075/40(a), (b).

## FIFTH CAUSE OF ACTION
## (VIOLATIONS FEDERAL UNFAIR COMPETITON)
### (By Plaintiffs against All Defendants and Does 1-25)

111. Plaintiffs' re-alleges each and every allegation contained in all prior paragraphs, against Defendants PepsiCo, Quaker Oats, Pinnacle, Hillshire Brands, and John Does of this Complaint for exploitive commercial purposes.

112. Defendants PepsiCo, Quaker Oats, and Pinnacle Foods, conduct and unlawful conspiracy, as alleged above, constituted and constitutes unfair, unlawful and fraudulent practices in violation of 1125 of the Lanham Act, and California Civil Code 3344. (Exhs. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 61, 17, 18, 19, 20, 23,. 24)

113. Plaintiffs' asserts that it is a crystalized issue that their Great Grandmother Anna S. Harrington is the trademark Aunt Jemima, but at no time did Mrs. Harrington give to Quaker Oats, Pinnacle the authority to misappropriate in part and/or in whole her own "personalized 64 recipes and/or 22 menus" that were utilized at her 22 Mansion Boarding House located at 117 Monroe Street, Syracuse, New York Syracuse, New York without paying a percentage of the net proceeds.

114. Plaintiffs assert and allege defendants omitted on their website acknowledgment of Harrington's employment within Quaker Oats while misappropriating "**origin of recipes**" or false representations, which were valuable

property rights and the goodwill of plaintiff, and has attempted to falsely create in the perception of the public impression, in the mind of the consumers that Anna S. Harrington 's recipes were solely a manifestation of their own product development, when in fact Quaker Oats / Pinnacle recorded every element of Harrington's work product to induce customers patronize Aunt Jemima products.

115.  Plaintiffs asserts and allege defendants PepsiCo, Quaker Oats, Pinnacle and John Does willful acts of omission on their website of Anna S. Harrington historical contribution, and concealment of the origin of recipes or false representation has caused the general public to believe Aunt Jemima to be a "**mythical character**;" in order, that Executives with Quaker Oats/PepsiCo could avoid paying royalties, of which, became the cause of the likeness of confusion, mistake or deception of the public to capitalize on the favorable commercial impression created by Anna S. Harrington and the association with the success of the 64 "Secret Recipes" and 22 menus.

116.  Defendants have been unjustly enriched by misappropriating and trading on the goodwill and reputation earned by Harrington winning numerous trophies, and that was developed by Harrington at great effort and expense.

117.  Defendants unlawful conduct, including as described above, was deliberate, knowing and in willful disregard of Anna S. Harrington's property rights.

118.  On information and belief, Plaintiffs' assert and allege that Quaker Oats advertised on YouTube that they entered into "written contracts" with Nancy Green, Anna Robinson which logically follows a contract had to exist for Anna S. Harrington:

> "Davis contacted Green and confirmed Jackson's appraisal. "She was a magnificent cook, an attractive woman of outgoing nature and friendly personality, gregarious in the extreme" (Sacharow, 1982, p. 145). She was the perfect person to bring the Aunt Jemima trademark to life. Meeting with high approval from all of the company officials, **Green was signed to an exclusive contract which would give her the right to impersonate Aunt Jemima for the rest of her life**." ("Did You Know... ?," 1989, p. 142) http://testaae.greenwood.com/doc_print.aspx?fileID=GR5184&chapterID=GR5184-561&path=books/greenwood

"She was proclaimed "Pancake Queen." She was signed to a "**lifetime contract**" ("emphasis added") and traveled on promotional tours all over the country. Flour sales were up all year and pancakes were no longer considered exclusively for breakfast. http://www.aaregistry.org/historic_events/view/nancy-green-original-aunt-jemima

"**Anna Robinson**...The officials at Quaker Oats were so impressed with the advertisements using Robinson that they commissioned Haddon Sunblom, a nationally known commercial artist, to paint a portrait of her. The Aunt Jemima package was redesigned around the new likeness. Robinson stayed on the Quaker Oats Company payroll until her death in 1951".

119. Defendants' conduct against Anna Harrington including as described above, constitutes a federal offense of unfair competition, unfair business practices, oppression, fraud and exploitation in violation of Section 43(a) of the Lanham Act, 15 U.S.C. §1125, and 15 U.S.C. §1041(B), including ICERD

**"It was her picture with a bandana used on Quaker Oats products." MacCallum, Tom (2009-04-25). "Aunt Jemima has roots in Richmond County".** Richmond County Daily Journal http://en.wikipedia.org/wiki/Aunt_Jemima

120. Plaintiff has been damaged by defendants' acts in an amount to be determined at trial, and if defendants' conduct is allowed to continue, plaintiffs' Estate and its goodwill and reputation will continue to suffer immediate, substantial, and irreparable injury that cannot be adequately calculated and compensated in monetary damages.

121. Defendants conduct has further caused and is causing damage and irreparable injury to Plaintiffs class members. Plaintiff and class members are accordingly entitled to disgorgement of PepsiCo, Quaker Oats and Pinnacle Foods, profits, and injunctive relief, plus interest and attorneys' fees, pursuant to 765 ILCS 1075/55 and request the following injunctive relief, (a) Order that PepsiCo, Quaker Oats and Pinnacle cease and desist from continuing to unlawfully utilize Harrington's

likenesses (b) that Defendants disgorge all its profits by taking over their deposit accounts without interfering with the distribution of the brand.

122.   Defendant PepsiCo, Quaker Oats, and Pinnacle Foods conduct has further caused and is causing damage and irreparable injury to Plaintiff and class members.

## SIXTH CAUSE OF ACTION

### (Breach of Contract)

### (By Plaintiffs against All Defendants and Does 1-25)

123.   Plaintiffs' re-alleges each and every allegation contained in all prior paragraphs, against Defendants PepsiCo, Quaker Oats, Pinnacle, Hillshire Brands, and John Does of this Complaint for exploitive commercial purposes.

124.   Defendants owed Anna S. Harrington a "duty of good faith" and "fair dealings by virtue of the Agreement. This duty included the obligation to act in fair and good faith when determining whether to deduct and/or pay a percentage or royalties and/or revenue for 64 original formulas and 22 complete menus to Harrington and/or Harrington's Estate and using a Olivia Hunter's image without her knowledge, and her identity in connection with products, if the as the Defendants manufactured or sold those products under their identities.

125.   Defendants Business Conduct statement provides that "[o]beying both the letter and spirit of the law is one of the foundations of PepsiCo, Quaker Oats and Pinnacle ethical standards" in regards to compensation after registering Trademark No. 1697862. (Exhs. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16)

126.   In the furtherance of the unlawful conspiracy alleged above and with the knowledge of the Quaker Oats, and PepsiCo, both breached its contracts with Anna S. Harrington and Harrington Class members Estate by and among other things, (1) Defendants have failed and refused to pay the amounts of royalties owed to Anna S. Harrington's Estate / Plaintiffs for revenue received as a result of the use of the "actress' name, voice or likeness in connection with product merchandising rights (in all its forms), (2) Defendants licensed the likeness, voice, esthetic look Anna S. Harrington to third parties without compensating the Harrington Estate for 60 years; (3) permitting

other third parties to use Anna. S. Harrington class member's likeness, such as when it expressly permitted Quaker Oats to utilize Harrington's image in the portrayal roll as Aunt Jemima.

127. Plaintiffs are informed and believe, and thereon allege, that Defendants intend to always deduct a percentage of the gross as handling fee and/or royalties from amounts owed to Anna S. Harrington's Estate / Plaintiffs.

128. Plaintiff asserts defendants cited $13 billion in 2012 for Annual Industry sales, with an average growth of 4.9%. Plaintiff asserts and alleges defendants acknowledged "Annual Breakfast Cereal Sales at $7.7 billion, of which does not include the "assets" owned by the company. http://www.slideshare.net/JaneGozenpud/quaker-oats-market-plan

129. Grandma Anna S. Harrington has performed all conditions, covenants and promises under the Contractual Agreement required of her during 15 years.

130. Defendants' refusal and failure to pay the amounts owed to Plaintiffs' for revenue received as a result of the use of the actors' name, voice or likeness, and physical appearance in connection with merchandising rights (in all its forms) used in commercial through the U.S.A. constitutes a material breach of Agreement.

131. Defendants' intention to not pay any proceeds, royalties, or income regardless of the actual handling costs violates Defendants' Business Conduct Statement and constitutes a material breach of the implied covenant of good faith and fair dealings in the Agreement.

132. "Defendants breached the parties' implied contract, wrongfully misappropriated Olivia Hunter's Hair style without adequate compensation from 1989, while utilizing the facial features of the Harrington's for the designs of the Aunt Jemima advertisements for products, and formulas for goods, as Defendants entered into contracts with third parties for the sole commercial purpose of profit and self-dealing without disclosing to Grandma Olivia Hunter that they would use her likeness to place her on the Aunt Jemima Box Reg. No. 1697862. As a direct and proximate result of Defendants' breaches of the Agreement, Plaintiffs' are informed and believe, and

thereon allege, that they have been damaged in the amount exceeding Two Billion Dollars ($2,000,000,000.00), together with interest thereon at the full legal rate pursuant to 765 ILCS 1075/5, and 765 ILCS 1075/40(a), (b), NY Code - Article 5, Title 13, and/or 35.01 Punitive/Exemplary Damages--Willful and Wanton Conduct, and Statutes 735 ILCS 5 Code of Civil Procedure. Section 2-604.1. As a proximate result of Defendants' conduct, Plaintiff and Harrington class members have been injured.

## SEVENTH CAUSE OF ACTION

### Fraud by Concealment

### (By Plaintiffs against All Defendants, and Does 1-25)

133. Plaintiffs' re-alleges each and every allegation contained in all prior paragraphs, against Defendants PepsiCo, Quaker Oats, Pinnacle Foods and Hillshire Brands of this Complaint, and John Does for exploitive commercial purposes. (Exh. 11, 12, 13, 14, 15)

134. Plaintiff asserts and alleges the Defendants PepsiCo, Quaker Oats, Pinnacle Foods lied about Anna Harrington's employment records, and omitted Harrington's name from their website, with Quaker Oats listed on the Certified Death Certificate as the "EMPLOYER". Plaintiff asserts and alleges defendants actively gave false, misleading statements while concealing that they owed her estate royalties as a result of the use of the Plaintiff's name, voice, or likeness for her original 64 formulas and 22 complete menu products sold as Aunt Jemima for merchandising rights (in all forms) using her image without obtaining a consent that said parties deposited inside the USPTO to exploit her identity in connection with products, as the Defendants manufactured and sold those products under both Harrington's identities. (Exhs. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 19)

135. Plaintiff's asserts and alleges the Defendants PepsiCo "advised" Quaker Oats to approach Grandma Olivia Hunter for a photo-opt after the death of Great Grandma Anna Harrington. Plaintiffs asserts and alleges Janet Silverberg, Chief Trademark Officer of PepsiCo at the behest of John Doe Executives schemed to misappropriate Olivia Hunter's image while she suffered from "**cancer**" and without her

knowledge and consent by depositing her likeness inside the USPTO for the Aunt Jemima Trademark Registration **No. 1697862** on June 28, 1991. Plaintiffs Hunter asserts and alleges that Janet Silverberg knew that Olivia Hunter was still alive when she knowingly and willfully filed a "false statement" on the application within 6 months before her death:

> "AUNT JEMIMA" is a fanciful name and does not refer to any known living individual. **The portrait also does not depict a living individual." (Exh. 44, 45)**





Aunt Jemima's 1989 Makeover

136. On Nov. 24, 1936, the Plaintiffs asserts John Stewart President of Quaker Oats **committed fraud and lied** on the USPTO Application, Reg. No. 71/385,940 by claiming the "**picture forming part of the mark is not the portrait of any individual**," while depositing our Grandma Harrington's image/likeness inside the USPTO and entering into an "unconscionable agreement" that was the "proximate" cause of injury to beat her out of a "fair share of equitable royalties" as Quaker Oats made more than $300,000,000.00 using her formulas and not relinquishing **revenue reports** as required by SAG. The Defendants used unfair surprise and oppression in the forthcoming years, thus constituting Breach of Contract, and fraud. Plaintiffs' assert Anna S. Harrington was absent meaningful choice on one of the parties to the contract without proper representation of a Lawyer. (Exhs. 1,2, 6, **19**, 44, 45, 48, **49, 50** )

137.  The Plaintiffs assert and allege in contravention to the UCC 2-302 defendants entered into a one-sided agreement that was unconscionable under the circumstances of gaining more than 60 years of revenue, royalties and payments without fairly compensating the estate of Anna S. Harrington, a.k.a. (Aunt Jemima) at the time the contract was made.

138.  The Plaintiffs' assert and allege PepsiCo, Quaker Oats Executive John Does had advance knowledge of Anna S. Harrington's vulnerability having left a Southern Plantation and engaged her solely for the purpose to misappropriate 64 original recipes and 22 complete menus, with conscious disregard not to pay a full accounting of royalties into the future or proceeds and through such wrongful conduct committed damages against her and are personally guilty of oppression, fraud, malice, and lying. With respect to PepsiCo, Quaker Oats, and Pinnacle Foods said Defendants maintained advance knowledge and conscious disregard to engage in acts of oppressions, fraud, or malice on the part of the executive officers, directors, or managing agents, including Janet Silverberg, Chief Trademark officer of PepsiCo. Said Defendants Quaker Oats acknowledged entering into contractual agreements with Nancy Green, Anna Robison, as logical follows they would not have approached the Anna Harrington without having entered into some form of contract.

139.  Plaintiffs' asserts and alleges that PepsiCo, and Quaker Oats targeted those Black Women at the State fair being Anna Robinson in Chicago, and Anna S. Harrington in Syracuse in a "pattern, practice" and premeditated discriminatory scheme to defraud and/or exploit Harrington into the future for monies, royalties, or payments that are owed as a result of using Anna S. Harrington's name, voice, or likeness in portrayal and sale of Aunt Jemima products, goods including merchandising rights (in all its forms.) in commerce.

140.  Plaintiff asserts and alleges that Anna S. Harrington did not have competent legal counsel, and did not know of the concealed facts that she and/or her Estate would be owed money into the future for the use of her image. Oppression refers to the unequal bargaining power, which essentially indicates that there was no real bargaining power.

141. Defendants intended to deceive Anna S. Harrington by concealing the fact, and learned that she was taken from Bennettsville S. Carolina by a White Family. Plaintiff asserts and alleges Defendants Quaker Oats with premeditation sought exploit Anna Harrington by praying upon her age, education, intelligence, business acumen and experience, and relative bargaining power, as they entered into a verbal and/or written one sided contract, without explaining the full terms to the weaker party constituting Breach of Contract including violations of International Convention on the Elimination of All Forms of Racial Discrimination (ICERD or more commonly, CERD).

142. Anna S. Harrington reasonably relied on the Defendants' deception.

143. As a direct and proximate result of Defendants' Quaker Oats/PepsiCo concealment of the important facts, Plaintiffs are informed and believe, and thereon allege, that they have been damaged in the amount exceeding Two Billion Dollars ($2,000,000,000.00), together with interest thereon at the full legal rate.

144. Defendants are guilt of oppression, fraud and malice and Plaintiffs are entitled to recover exemplary and treble damages pursuant to NY Code - Article 5, Title 13, and/or 35.01 Punitive/Exemplary Damages--Willful and Wanton Conduct, and Statutes 735 ILCS 5 Code of Civil Procedure. Section 2-604.1, 765 ILCS 1075/5, and 765 ILCS 1075/40(a), (b) for sake of example and by way of punishing Defendants, in an amount to be determined by the trier of fact.

## EIGHT CAUSE OF ACTION

### Promissory Fraud

### (By Plaintiffs against All Defendants, and Does 1-25)

145. Plaintiffs' re-alleges each and every allegation contained in all prior paragraphs, against Defendants PepsiCo, Pinnacle Foods, Quaker Oats, Hillshire Brands and John Does of this Complaint for exploitive commercial purposes.

146. On information and belief, Plaintiff asserts Defendants made false promises to Nancy Green, Anna Robinson and Anna S. Harrington that each time Plaintiff's name, voice, or likeness was used in connection with its products, goods, including merchandising rights for products sold through interstate commerce and that they would

receive a percentage of the monies / royalties received. On information and belief, Plaintiff asserts Defendants also promised Anna S. Harrington that they would provide accurate revenue statements when revenue had been generated relating to products, goods, and merchandising. These false promises were important to the transaction.

147. Defendants did not intend to fully perform the promises compensate Harington equitable in exchange for 64 complete formulas and 22 menus when they entered into agreements with Anna S. Harrington, because she was a Black Women from a Plantation compared to similar situated White females employees within PepsiCo, Quaker Oats, and Pinnacle. (Exhs. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10)

148. Defendants knew that they could exploit and create the false belief that no money was owed after death to the Plaintiffs by failing to provide "**revenue statements**" to Harrington's Estate, thus constituting Promissory Fraud; in addition, violations of the International Convention on the Elimination of All Forms of Racial Discrimination (ICERD or more commonly, CERD). In addition, Defendants did not intend to pay the money to Anna S. Harrington as they promised. (Exhs. 11, 12, 13, 14, 15, 16, 19)

149. The Plaintiffs' assert and allege Quaker Oats and Pinnacle had advance knowledge of Anna S. Harrington's vulnerability having left a Southern Plantation and employed her with a conscious disregard not to pay a full accounting of royalties and through such wrongful conduct committed damages against her and is personally guilty of oppression, fraud, or malice. With respect to a corporate employer, the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the be on the part of an officer, director, or managing agent of the corporation and/or part of an officer, director, or managing agent of the corporation.

150. Anna S. Harrington reasonably relied upon Defendants promises.

151. Plaintiff asserts and alleges Defendants Quaker Oats did not honor or keep their promises or contractual agreements and Plaintiffs reliance upon Defendants' false promises was a substantial factor in causing Anna S. Harrington and her Estate's harm by depositing her image inside the USPTO without first obtaining a consent to exploit

her identity in connection with products, as the Defendants manufactured and sold those products under both Harrington's identities. (Exhs. 25, 26, 27, 28, 29)

152. As a direct and proximate result of Defendants deceit and promise, Plaintiffs are informed and believe, and thereon allege, that they have been damaged in the amount exceeding **Two Billion Dollars (2,000,000,000.00),** together with interest thereon at the full legal rate.

153. Defendants are guilty of oppression, exploitation, fraud, and malice and Plaintiffs are entitled to recovery of exemplary and treble damages pursuant to NY Code - Article 5, Title 13, and/or 35.01 Punitive/Exemplary Damages--Willful and Wanton Conduct, and Statutes 735 ILCS 5 Code of Civil Procedure. Section 2-604.1, 765 ILCS 1075/5, and 765 ILCS 1075/40(a), (b) for the sake of example and by way of punishing Defendants, in an amount to be determined by the trier of fact.

## NINTH CAUSE OF ACTION

### Conversion

### (By Plaintiffs against All Defendants, and Does 1 through 25)

154. Plaintiffs' re-alleges each and every allegation contained in all prior paragraphs, against Defendants PepsiCo, Quaker Oats, Pinnacle, and John Does of this Complaint for exploitive commercial purposes. (Exhs. 16, 17, 18, 19, 20, 21, 22, 23)

155. Defendants PepsiCo, Quaker Oats, Pinnacle, Hillshire had exclusive control over the use of Anna. S. Harrington's' name, voice or likeness in connection with products, goods, and other merchandising rights. Defendants also had the exclusive right to collect amounts owed to Plaintiffs for revenue received as a result of the use of the Harrington's name, voice or likeness in connection with products, goods, including merchandising. As such, Defendants Quaker Oats and Pinnacle acted as Plaintiff's agent and were required to turn over to Plaintiff's the sum received by Defendants on Plaintiffs behalf. (Exhs. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17

156. Defendants collected and received money in connection with products, goods, including merchandising rights by depositing exploiting her image inside the USPTO without first obtaining consent in connection with products, as said defendants

manufactured and sold those products under both Harrington's identities. Defendants knew that a specific amount of money it collected and received in connection with products, goods, including merchandising rights owed a percentage of royalties to Anna S. Harrington, as well as, the Harrington Estate. Plaintiffs' have an immediate right to possession of these sums. Despite this knowledge, Defendants fraudulently procured all the money after Anna S. Harrington's death for predominately White Executive employees use within Quaker Oats and PepsiCo. (Exh. 25, 26, 27, 28, 29)

157. Despite a demand from Plaintiffs on October 28, 2013 to acquire a copy of the contract, Defendants Quaker Oats have deliberately failed and refused to pay the amounts owed to Anna S. Harrington's estate for revenue received as a result of the use of Anna Harrington's name, voice or likeness in connection to goods, products of 64 original formulas by Harrington and 22 complete menus including merchandising for Aunt Jemima.

158. Plaintiffs assert and allege "Likeness" refers to a visual image of Anna Harrington, Deloris Hoffman, and Grandma Olivia Hunter, whether in a photograph, drawing, caricature, or other visual presentation. The visual image need not precisely reproduce the plaintiff's appearance, or even show his or her face, so long as it is enough to evoke the plaintiff's identity in the eyes of the public.

159. As a direct and proximate result, Plaintiff asserts and alleges Defendants within Quaker Oats, PepsiCo, Pinnacle and Hillshire owed Plaintiffs', and Plaintiffs are informed and believe, and thereon allege, that they have been damaged in the amount exceeding **Two Billion Dollars ($2,000,000,000.00)** together with interest thereon at the full legal rate.

160. Defendants are guilty of oppression, fraud, and malice for "exploitive commercial purposes" in violation of International Convention on the Elimination of All Forms of Racial Discrimination (ICERD or more commonly, CERD), and Plaintiffs are entitled to recovery exemplary and punitive damages pursuant to NY Code - Article 5, Title 13, and/or 35.01 Punitive/Exemplary Damages--Willful and Wanton Conduct, and Statutes 735 ILCS 5 Code of Civil Procedure. Section 2-604.1., 765 ILCS 1075/5, and

765 ILCS 1075/40(a), (b). for the sake of example and by way punishing Defendants, in an amount to be determined by the trier of fact.

## TENTH CAUSE OF ACTION

### Accounting

### (By Plaintiffs against All Defendants and Does 1-25)

161. Plaintiffs' re-alleges each and every allegation contained in all prior paragraphs, against Defendants PepsiCo, Quaker Oats, Pinnacle Foods, Hillshire Brands of this Complaint, and John Does. (Exhs. 25, 26, 27, 28, 29, 30, 31)

162. Plaintiffs' are informed and believe, and based thereon alleges, that Quaker Oats and PepsiCo and/or their other entities or assigns have and are continuing to receive substantial payments from the sale of 64 original formulas products by Harrington, including merchandising rights for the use of Anna S. Harrington's likeness.

163. Plaintiffs do not precisely know how much money has been earned in 59 years by Quaker Oats, PepsiCo and Pinnacle for any and all Aunt Jemima products, goods, and merchandise. In November 2001 there was a $15.75 billion dollars acquisition offer to purchase Quaker Oats that may have resulted in the sale around $13 billion dollars. Plaintiffs assert and allege that Quaker Oats and PepsiCo by and through other entities or assignees have retained any and all monies for the last 59 years for all royalties and "Net Receipts" / Profits. Plaintiffs' Anna S. Harrington's Estate is owed pursuant to all prior written and/or oral promises and agreements as the Plaintiffs' have not seen all the agreements that may affect the amount of royalties and "Net Receipts" / Profits.(Exhs. 17, 18, 19, 20, 21, 22, 23, 24, 32, 33, 34, 35, 35, 37, 38, 39, 40, 41, 42)

164. Additionally, Plaintiffs does not precisely know how much money has been earned from the 64 original formulas and products by Harrington, goods, and services for the use of Anna S. Harrington's likeness, or voice as Aunt Jemima. (Exhs. 37, 38, 39, 40)

165. Anna S. Harrington's Estate should have been compensated in connection therewith, since playing the Actress as well as preparing pan cakes as Aunt Jemima at state fair events that resulted in trademarking her likeness in 1937. Plaintiff asserts and alleges defendants were not only recording her likeness as she cooked at State Fair

events. An accounting is necessary in order to determine the exact amount of all monies, revenues, royalties, profits and proceeds thereof received by Defendants and owed to the Estate of Anna S. Harrington and due to the reason outline regarding the foregoing acts that are in breach of said Defendants' contractual, equitable and other obligations.

166.   Quaker Oats and/or PepsiCo has materially breached the Agreements by not providing any information to the Plaintiffs Estate as to any agreements, and in view of Quaker Oats wanton and malice actions Plaintiffs' are entitled to a full and complete accounting from Quaker Oats/PepsiCo and/or Pinnacle.

167.   Because Plaintiffs are a third party beneficiary to the sale of good, products including merchandise of Aunt Jemima products. Plaintiffs are entitled to a full and complete accounting from Quaker Oats, and PepsiCo, including but not limited to an accounting of all related agreements entitled into that relate to any of this income.

168.   The Plaintiffs assert and allege defendants engaged in "disparate impact," deplorable acts, and the consequences of the practices fell more harshly on the Estate of Anna S. Harrington, as it is a fact that they have not paid royalties for 59 years. On information and belief, plaintiff believes Nancy Green, and Anna Robinson's estate is not being adequately compensated, because they were Black females.

169.   In addition to breach of contract damages, Plaintiffs' therefore requests that the Court order Quaker Oats and PepsiCo to provide a complete accounting of all sales of Aunt Jemima Product from 1955 to present so that Plaintiffs' can ascertain the full extent of the unpaid royalties, and/or proceeds for the use of Anna S. Harrington's likeness. Plaintiffs' re-alleges each and every allegation contained in all prior paragraphs against Quaker Oats and PepsiCo, of this Complaint.

## ELEVENTH CAUSE OF ACTION
### (Unjust Enrichment & Disgorgement)
### (By Plaintiffs against All Defendants and Does 1-25)

170.   Plaintiffs' re-alleges each and every allegation contained in all prior paragraphs, against PepsiCo, Pinnacle, Quaker Oats, Hillshire, and John Does of this Complaint for Unjust Enrichment. (Exhs. 9, 25, 26, 27, 28, 29, 30, 31)

171.  To the detriment of Plaintiffs Estate of Anna Short Harrington and Great Grandchildren Class members, Defendants PepsiCo, Pinnacle Foods, and Quaker Oats has been and continues to be unjustly enriched as a result of the unlawful and/or wrongful conduct alleged herein where they have not paid royalties in 60 years. Quaker Oats/PepsiCo have unjustly benefited through the sale of products, goods, inclusive of merchandise utilizing the likeness of Anna S. Harrington Class members.

172.  Between Defendants Quaker Oats / PepsiCo / Pinnacle and Plaintiff Class members, it would be unjust for Quaker Oats/PepsiCo to retain the benefits attained by their wrongful actions. Accordingly, Plaintiff and class members seek full restitution of Quaker Oats / PepsiCo enrichment, benefits and ill-gotten gains acquired from 1955 to present for the unlawful and wrongful conduct and other legal and equitable relief for the courts deems just and proper. (Exhs. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16)

173.  Defendants snapped pictures of Olivia Hunter's hair, removed the bandana on Great Grandmother Anna Harrington's as she portrayed Aunt Jemima, and did not disclose to Grandmother Hunter that they were using her hair style on all Aunt Jemima products lines.

174.  Defendants unilaterally misappropriated Olivia Hunter's likeness without compensation and utilized it on any and all Aunt Jemima product lines.

175.  As a direct and proximate cause of tortious acts, Defendants have been unjustly enriched by selling Aunt Jemima products lines without compensation to the Harrington family, while entering into agreements with third parties to recreate the Aunt Jemima design for the sole commercial purpose and self-dealing.

176.  Plaintiffs have not received any compensation for Defendant's tortious and unlawful use of Olivia Hunter's hair style; in addition, to the likeness of Anna S. Harrington, and non-payment for 64 original recipes and 22 complete menus yet Defendants have unfairly profited from same.

177.  Plaintiff asserts and alleges Defendants within Quaker Oats, PepsiCo, Pinnacle, and Hillshire owed Plaintiffs', and Plaintiffs are informed and believe, and thereon allege, that they have been damaged in the amount exceeding **Two Billion**

**Dollars ($2,000,000,000.00)** together with interest thereon at the full legal rate pursuant to 765 ILCS 1075/5, and 765 ILCS 1075/40(a), (b), NY Code - Article 5, Title 13, and/or 35.01 Punitive/Exemplary Damages--Willful and Wanton Conduct, and Statutes 735 ILCS 5 Code of Civil Procedure. Section 2-604.1, NY Code - Article 5, Title 13, and/or 35.01 Punitive/Exemplary Damages--Willful and Wanton Conduct, and Statutes 735 ILCS 5 Code of Civil Procedure. Section 2-604.1.

**TWELVTH CAUSE OF ACTION**

**Disparate Impact**

**The International Convention on the Elimination of all forms of Racial Discrimination Article 5(d) (vi) *ET. seq.***

**(By Plaintiffs against All Defendants and Does 1-25)**

178.   Plaintiffs' repeat and re-alleges the allegations contained in the foregoing paragraphs of this Complaint against Defendants PepsiCo, Quaker Oats, Pinnacle Foods, Hillshire Brands of this Complaint, and John Does. (Exh. 9)

179.   Plaintiff Harington's' and the other potential class members are members of a protected class of African Americans believe to be from the Gallah Nation.

180.   On information and belief Quaker Oats, PepsiCo, and Pinnacle engaged in discriminatory employment practices which are statistically significant as it pertains to an equitable fair share of royalties derived from Aunt Jemima product lines worldwide that control more than 45% of the entire breakfast market. The actions by said perpetrators have caused and adverse effect to more than 15 members of Anna Short Harrington's family, including collateral economic injury to African Americans within Quaker Oats, and Pinnacle of which has caused "adverse impact" within the company and on the Estate of Anna S. Harrington in comparison to similar situated Caucasian people that repeated billions that were not legally authorized or owned the Aunt Jemima trademark in violation to 15 U.S.C. 1041(B). (Exhs. 25, 26, 27, 28, 29, 30, 31)

181.   Plaintiff asserts and alleges defendants omitted Anna S. Harrington's contribution from her website after they slid up under her and obtained 64 formulas, and 22 complete menus, branded her image inside the USPTO and did not have a so-called

authorized contract to exploit the likeness of Harrington as billions in royalties were not paid over 60 years with an inequitable workforce that consisted predominately 95% of White people to the detriment and at the expense of the African American community, resulting "uneven trade" and "unfair business practices".

182. On information and belief, Plaintiffs' assert and allege according to PepsiCo's Annual 2012, report their total brands made $65,492,000,000 billion dollars, and the year prior PepsiCo / Quaker Oats generated $65,881,000,000 billion dollars in sales, while failing to pay one nickel in royalties to the estates of Nancy Green, Anna Robinson, and/or Anna S. Harrington in over 59 years. (Exhs. 37, 38)

183. By not allocating African Americans an equitable percentage of the royalties to Anna Harrington, Nancy Green and Anna Robinson's Estates, Defendants are engaged in unfair business practice while spending $500 million annually to market and promote their business model, and not allocating a fair share to the African American community nor have they employed an equitable or comparable amount of African Americans within Quaker Oats, of which, ultimately relates directly to the decisions about wealth creation within the Black community, advancement, opportunity and compensation as less than 2% of the above amount was spent with the Black community. (Exhs. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12 , 13, 14, 15, 16)

184. These policies and practices are not manifestly related to the jobs of class and they do not further any important business purposes other than to extract resources out of the Black community. (Exhs. 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35)

185. Even if Quaker Oats / PepsiCo could demonstrate that these policies and practices are manifestly related to the jobs of the class or could show that they significantly further an important business purpose, comparably effective practices would cause a significantly lesser adverse impact on the identifiable protected class.

186. Quaker Oats / PepsiCo / Pinnacle therefore engaged in a continuous **"Pattern and Practice"** of disparate impact discrimination in violation of Minn. Stat. 363.03, sub. 11 and continuing throughout the liability period to the present. This conduct represents a continuing violation of the rights of the Plaintiffs and the class.

187.   As a direct and proximate result, Plaintiff asserts and alleges Defendants within Quaker Oats and PepsiCo owed Plaintiffs', and Plaintiffs are informed and believe, and thereon allege, that they have been damaged in the amount exceeding **Two Billion Dollars ($2,000,000,000.00)** together with interest thereon at the full legal rate pursuant to 765 ILCS 1075/5, and 765 ILCS 1075/40(a), (b), NY Code - Article 5, Title 13, and/or 35.01 Punitive/Exemplary Damages--Willful and Wanton Conduct, and Statutes 735 ILCS 5 Code of Civil Procedure. Section 2-604.1.

## THIRTEENTH CAUSE OF ACTION

### The International Convention on the Elimination of all forms of Racial Discrimination Article 5(d) (vi) *et. seq.*

### (By Plaintiffs against All Defendants and Does 1-25)

188.   Plaintiffs' re-alleges each and every allegation contained in all prior paragraphs, against Defendants PepsiCo, Quaker Oats, Pinnacle, Hillshire and John Does of this Complaint in violation of ICERD or CERD.

189.   Plaintiffs assert and allege they are members of a racial minority, and that the Harrington Family was discriminated against within a particular group of activities set forth in the statute. Those activities include the right to "make and enforce contracts . . . as is enjoyed by white citizens." Plaintiffs assert and allege race discrimination based upon contractual rights. (Exhs. 31, 32, 33, 34, 35, 36, 37, 38, 39, 40)

190.   Defendants PepsiCo, Quaker Oats, Pinnacle,  Hillshire Brands, and John Does conduct and unlawful conspiracy, as alleged above, constituted and constitute unfair, unlawful and fraudulent business practices in violation of §765 ILCS 1075/5, and 765 ILCS 1075/40(a), (b). The conduct is unfair, unlawful and fraudulent because among other things it violates NY Code - Article 5, Title 13, and/or 35.01 Punitive/Exemplary Damages--Willful and Wanton Conduct, and Statutes 735 ILCS 5 Code of Civil Procedure. Section 2-604.1.of the N.Y. Civil Rights Law Sect. 51.

191.   Defendants Quaker Oats, PepsiCo, Pinnacle and Hillshire conducted have further caused and is causing damage and irreparable injury to Plaintiffs Class and class members. Plaintiff Class members are accordingly entitled to disgorgement of Quaker

Oats / PepsiCo's profits and injunctive relief, plus interest and attorneys' fees, pursuant to California Code of Civil Procedure §1021.5 and request that the following injunctive relief:

a) That PepsiCo, Quaker Oats, Pinnacle, and John Does disgorges a portion of its profits obtained from the utilization of Plaintiff Harrington Class member's likeness.

192. Plaintiff asserts and alleges that Quaker Oats, PepsiCo, Pinnacle, and Hillshire discriminated against Anna S. Harrington, and Harrington's Estate directly based on race and willfully failed to pay any royalties, revenue and/or any monies of any sort to her estate for 59 years after her death while exploiting her likeness without a consent because she was a Black Female compared to similar situated White people employed within Quaker Oats, PepsiCo, Pinnacle, and Hillshire.

193. Plaintiff asserts and alleges defendants engaged in premeditated illegal acts that make it an unlawful employment practice for an employer to discriminate against any individual such as Anna S. Harrington with respect to his compensation in the form of royalties, terms, conditions, or privileges of employment, because of such individual's race, color, or national origin.

194. Plaintiff Harington's' are members of a racial minority, (2) Defendants intended to discriminate against Plaintiffs on the basis of race; and (3) Plaintiff Harrington won numerous trophies for cooking while working for Quaker Oats at State fair events as her estate was not equitably compensated after her death; (4) the discrimination concerned one or more of the activities in the statute; and (5) that sufficient evidence exists from which the Court can find a causal connection between Race discrimination and snapping a picture of Olivia Hunter's hair and combining the family features and failure of Quaker Oats to pay any royalties in 59 years to Anna S. Harrington Estate because she and her daughter were Black females.

195. On information and belief, Plaintiffs' assert and allege that Quaker man (affectionately known as Larry) underwent a subtle makeover-including "**revealing more radiant skin**" from daily oatmeal masks, and Plaintiffs believe his family and/or heirs are still receiving payments for the use of his likeness. Plaintiff asserts and alleges

that Executives within PepsiCo, Quaker Oats, Pinnacle, and John Does that were allotted stock options were bequeathed stocks option and were able to pass them down from generation to generation for their family members.

196. Plaintiff asserts and allege "that others Caucasians especially Executives within Quaker Oats not in [their] protected class were treated more favorably by misappropriating the Harrington Estate royalties for their own personal gain. Plaintiffs asserts and alleges that there is a stark "pattern of discrimination" unexplainable on grounds other than Race."

197. Around or about 1989, the Plaintiff asserts and alleges that PepsiCo, Quaker Oats, Pinnacle and John Does "had a continuing need to exploit the likeness, hairstyle, family features and skin tone of the [Harrington Family], and skills, and services in that [their] various duties were still being performed". Plaintiffs asserts Executives from Quaker Oats contacted "Olivia Hunter" and sent a team of photographers to the house for a photo-opt to snap pictures of the youngest daughter "Olivia Hunter's hair" to capture the family likeness, skin tone, ear rings, and remove the "red bandana" that became a politically charged hot button. Further to wit, Quaker Oats Executives insisted on acquiring pictures of **Olivia's hair follicles**". It became imperative that Quaker acquire Olivia's Hair follicles. ("Emphasis Added") http://zmblackhistorymonth2011.blogspot.com/2011/02/feb-13-aunt-jemima-negative-stereotype.html

> "AUNT JEMIMA: One of the most recognized symbols of the happy "mammy" used to market pancakes and other domestic products to whites since the 1880s. The name "Jemimah" once had esteem as the eldest of Job's (the Bible) daughters and as a city in ancient **Arabia named after its Queen**."(p. 38)

198. Plaintiff asserts and alleges that the Harrington as well as members within her estate are Class members and are members of a racial minority group, and that the Class was discriminated against within a particular group of activities set forth in the

statute. Those activities include the right to "make and enforce contracts . . . as is enjoyed by White citizens."

199. Plaintiffs assert and allege the class the rights of a third party as the basis of his cause of action when there is a relationship between the third party and the plaintiff which has been adversely affected by the defendant's conduct.

200. Plaintiffs assert and allege that the Aunt Jemima which includes Nancy Green, Anna Robinson Class endured discrimination directed against them including Anna S. Harrington estate because of their/her race or their/her association with a racial minority.

201. Due to Defendants' unlawful discrimination, Plaintiffs has suffered" damages. Plaintiff asserts and alleges Anna S. Harrington was a Grandmother. All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

202. As a result of the wanton and malice conduct of Defendants and the conspiracy, Plaintiffs Harrington Class Estate members have been damaged as described above and the wrongful conduct of defendants require and other legal and equitable relief that the Courts deems just and proper including violations of CERD.

203. As a direct and proximate result, Plaintiff asserts and alleges Defendants within Quaker Oats, PepsiCo, and Pinnacle owed Plaintiffs', and Plaintiffs are informed and believe, and thereon allege, that they have been damaged in the amount exceeding **Two Billion Dollars ($2,000,000,000.00)** together with interest thereon at the full legal rate pursuant to 765 ILCS 1075/5, and 765 ILCS 1075/40(a), (b), NY Code - Article 5, Title 13, and/or 35.01 Punitive/Exemplary Damages--Willful and Wanton Conduct, and Statutes 735 ILCS 5 Code of Civil Procedure. Section 2-604.1.

## FOURTEETH CAUSE OF ACTION
## DECEPTIVE ACTS AND PRACTICES

**IN VIOLATION OF N.Y. GEN. BUS. LAW §349 & 15 U.S.C.A. §1117**

**(By Plaintiffs against All Defendants and Does 1-25)**

204.  Plaintiffs' re-alleges each and every allegation contained in all prior paragraphs, against Defendants' PepsiCo, Quaker Oats, Pinnacle, Hillshire, and John Does of this Complaint. (Exhs. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17)

205.  Plaintiffs' assert and allege PepsiCo, Quaker Oats, Pinnacle and John Does willfully omitted from its corporate website hiring Anna S. Harrington to portray the roll of Aunt Jemima, because it was obvious when they first approached her that she had her "**own recipes**" as she prepared "**exquisite meals**" for "**Governors**" which included pancakes prior to Defendants discovering her at the State Fair of Syracuse. Plaintiffs asserts and alleges defendants misappropriated in part and/or in whole at least 64 original recipes and 22 complete menus from Anna Harrington and then omitted her name from the corporate history ledger while carrying on the  recipes under the trademark "Aunt Jemima" while not compensating her estate for the use of the Harrington's likeness.

206.  Plaintiffs asserts and allege Defendants deposited and exploited both Harrington's image inside the USPTO without first obtaining a consent in connection with products, as said defendants  manufactured and sold those products under both Harrington's identities. (Exhs. 25, 26, 27, 28, 29)

207.  On information and belief, defendants' PepsiCo, Quaker Oats, Pinnacle, and Hillshire unlawful conduct was deliberate, knowing and in willful disregard of Anna S. Harrington's proprietary rights including but not limited to Olivia Hunter compared to similar situated Caucasian people inside of PepsiCo, Quakers Oats, and Pinnacle Foods for exploiting their likeness just like in the "Happy Days Cast" lawsuit and failure to compensate for their services as Actors).

208.  Defendants' conduct was directed at consumers in State of New York, and throughout the country including those quite likely to be familiar with Aunt Jemima Brand, including the history of the contribution of Anna S. Harrington, Deloris Hoffman, Laura Mae Sizemore, and Olivia Hunter.

209. Unless defendants' PepsiCo, Quaker Oats, Pinnacle, and John does are enjoined for damages for willful acts of omission of the historical contribution of Anna S. Harrington for the recipes of Aunt Jemima, the public is likely to be misled to believe origins of Aunt Jemima as a "**mythical character;**" in order, to misappropriate royalties, for goods and services instead of paying Anna S. Harrington' that created her own recipes as well as compensate Olivia Hunter for acquiring a specimen of her "hair follicle" to use the family attributes that was exploited on the 1989 Aunt Jemima box.

> **"Aunt Jemima dominates the pancake batter mix with a greater than 40 percent market share. The Aunt Jemima product line represents $300 million of Quaker Oats' $5.3 billion in annual sales, and this marketing strategy is indicative of the promotional savvy employed in the present and past. It has been used to keep Aunt Jemima the most popular pancake mix in America."** http://testaae.greenwood.com/doc_print.aspx?fileID=GR5184&chapterID=GR5184-561&path=books/greenwood

210. Plaintiff asserts and alleges, once PepsiCo, Quaker Oats, Pinnacle, and John Does acquired pictures of Olivia Hunter's hair, they then began "to gear up for the 1990s, as the defendants PepsiCo, Pinnacle, and Quaker Oats conducted "extensive and comprehensive" "**market research studies**" after they acquired pictures of "Olivia Hunter's" hair follicle to do research in **12 American cities**.

211. Plaintiff asserts and alleges Naomi Henderson, principal of RIVA Marketing and Research, conducted a target focus-group study. She said that most of the women interviewed "**did not like the bandanna**". **They viewed it as a symbol of slavery**" (Brown, 1990, p. 5). Based on the results of those studies the company revamped the image "in a more contemporary light, "**while preserving the important attributes**" of **warmth, quality, good taste, heritage and reliability**," said Barbara R. Allen, vice president of marketing for the Quaker Oats Company's convenience foods division ("Aunt Jemima Trademark," 1989, p. 2)."

212. Plaintiff D.W.H. asserts that when the Defendants PepsiCo, Pinnacle, Quaker Oats, approached Harrington's youngest daughter "Olivia Hunter" and procured her image for her hair style, cheeks, nose, lips, hair line, as they knew she embodied the

"**warmth, quality, good taste, heritage and "reliability**" of her mother in the sense that she was a foster Grandmother for the City of Syracuse that ran a "**Respite Care**" for "Babies" ("emphasis added") around the tender age "Age" of 5 years old or younger for the City of Syracuse and State of Florida.

213.   On numerous occasions she would take in **African American and White kids** that both cities didn't have anywhere else to place. It's estimated that more than 30 kids went into the Harrington Respite Care. Plaintiffs asserts and alleges Quaker Oats/PepsiCo Executives with wanton malice deliberately failed to pay royalties to the Harrington Estate for 58 years, which prevented Olivia Harrington from expanding her Respite Care for babies in Syracuse, as city officials struggled to find housing for babies. (Exh.      Syracuse Newspaper & Obituary )

214.   Plaintiffs assert and allege, Aunt Jemima dominates the pancake batter mix with a greater than **45% percent market share globally**. ("emphasis added") The Aunt Jemima product line represents more than **$300 million of Quaker Oats' $5.3 billion in annual sales**, and this marketing strategy is indicative of the promotional savvy employed in the present and past. It has been used to keep Aunt Jemima the most popular pancake mix in America, and worldwide.

215.   One year to the date of the release of the latest cosmetic change for Aunt Jemima, a study was conducted by the author and Susanna Hornig (1992) to see what impact the change had had on consumers' perception of Aunt Jemima, while concealing from the general public that they had acquired a lock from Olivia Hunter's hair follicle as they combined the family features. The researchers were interested in doing this study because the 1989 makeover was the most radical Aunt Jemima had ever undergone. It would be the first Aunt Jemima logo to "distance itself totally" from domestic work and the first not to have any kind of headwear."

216.   **By the end of the summer of 1989 the new image adorned all forty Aunt Jemima products, and Quaker Oats.**

217.   Unless defendants Quaker Oats, Pinnacle, PepsiCo and Hillshire are enjoined for damages for the use of Anna S. Harrington, Deloris Hoffman, Laura Mae

Patterson, from Oct. 21, 1955 including using the likeness of Grandmother Olivia Hunter for the promotion model, the public is likely to be misled as to the origin of the defendants' exploiting the likeness of the Harrington Family for goods, and services, and the Plaintiffs' Estate will continue to suffer irreparable injury which cannot be adequately calculated or compensated solely by money damages.

218. Olivia Hunter was unaware that the Defendants utilized her hair style on her mother's face for all goods, and products to market throughout the world all Aunt Jemima products. Defendants' unlawful business practices have the tendency or capacity to deceive and thus violate the Georgia Fair Business Practices Act (hereinafter "GFPBA"), set forth at OCGA § 10-1-390, et seq. *Terrence Davidson vs.* Onika Maraj and Pink Personality Case. No. 1:14-cv-00507-RLV

219. Plaintiffs are entitled to a declaration that PepsiCo, Quaker Oats, and Pinnacle may not continue to use the proprietary and confidential information, including but not limited to 64 recipes, menus, and marketing materials, in connection with Anna S. Harrington, and Olivia Hunter without paying royalties in violation of ICERD. 90% of the time a person that commits the crime returns to the scene of the crime, and in the case of Quaker Oats, said parties approached the Daughters Aunt Laura Mae Patterson or Sizemore including Deloris Hoffman by which Harrington passed down Cuisine of South Afrique descent.

220. As a direct and proximate result, Plaintiff asserts and alleges Defendants within PepsiCo, Quaker Oats, Pinnacle, Hillshire, and John Does owed Plaintiffs', and Plaintiffs are informed and believe, and thereon allege, that they have been damaged in the amount exceeding **Two Billion Dollars ($2,000,000,000.00)** together with interest thereon at the full legal rate pursuant to 765 ILCS 1075/5, and 765 ILCS 1075/40(a), (b), and The Lanham Act **15 U.S.C.A. § 1117**.

**FIFTEENTH CAUSE OF ACTION**

**For Payment of Attorney's Fees and Costs**

**(By Plaintiffs against All Defendants and Does 1-25)**

221. Plaintiffs' re-alleges each and every allegation contained in all prior paragraphs, against PepsiCo, Quaker Oats, Pinnacle, Hillshire and John Does of this Complaint.

222. The prevailing party will be entitled to be reimbursed by the non-prevailing party for all cost and expenses so incurred (including reasonable attorneys' fees, costs of bonds, and fees and expenses for expert witnesses).

223. Plaintiffs assert and allege that Quaker Oats, Pinnacle, PepsiCo breached the contracts with said Plaintiffs from the Harrington Estate. Plaintiffs assert and allege that they are entitled to attorneys' fees and costs in prosecuting this action pursuant to Right of Publicity Act. 765 ILCS 1075/55, and 15 U.S.C.A. §1117.

## **PRAYER FOR RELIEF**

1. **WHEREFORE,** Plaintiffs pray for relief as follows:

2. Plaintiffs seek a Preliminary Injunction and Order Seizure of PepsiCo, Quaker Oats, Pinnacle, and Hillshire bank accounts and to force said Defendants to relinquish a fair share of royalties of any and all Aunt Jemima product line deposits from bank accounts without disrupting the "distribution" of Aunt Jemima Products. Said seizure is necessary to assist the Plaintiffs in recapturing their equitable fair share of royalties pursuant to The Lanham Act §34(d) (1) (A), 15 U.S.C. A. 2226(d) (1(A), and 765 ILCS 1075/50 as the defendants utilize the likeness of the Harrington's in commerce.

**3. On the First Cause of Action:**

(a) Issue a Declaratory Order Affirming that the Plaintiffs Owns both Aunt *Jemima Trademarks that are the images of Anna Short Harrington, and Olivia Hunter **Reg. No. 71385940 and Reg. No. 1697862.**

(b) Plaintiff seeks Certification of the action as a Class Action pursuant to the Federal Rules of Civil Procedure, and appointment of Plaintiff as the Class Representative and his counsel of records as Class Counsel:

(c) For actual statutory, compensatory and punitive damages in an amount to be determined according to proof, but in no event less than **$2 Billion Dollars**

**($2,000,000,000.00),** plus compounded interest, a future royalty, and $1,000,000,000 billion in equity stock combined in PepsiCo, Quaker Oats, and Pinnacle thereon at the maximum rate allowed by law;

(d)     For attorneys' fees and costs incurred in connection with the enforcement of the Agreement;

(e)     A declaration by this court that Defendants' conduct constituted a conspiracy, and that they are each jointly and severally liable for the conduct    of or +damage inflicted by any other defendant;

(f)     Actual damages, statutory damages, punitive damages, and such other relief as provided by the statutes cited herein;

(g)     Prejudgment and post –judgment interest on such monetary relief

(h)     Equitable relief in enjoining future use of the likeness, of Anna Harrington Plaintiffs Class members, and declaring null, void, and/or unenforceable any contractual provisions or NCAA rules purporting to limit the right of Plaintiff Harrington's Class members to receive just compensation for proceeds, and/or royalty payments.

(i)     Issue an order that Quaker Oats / PepsiCo from now until the future must pay 9.5 % percent of gross proceeds or profits for any and all Aunt Jemima products, goods, and merchandise into the future. We believe it just that the estates of Nancy Green, Anna Robinson, and Anna S. Harrington should be justifiably compensated.

(j)     Within a 10 year window Quaker Oats has engaged in deplorable discriminatory practices, thus warranting a Preliminary Injunction prohibiting Quaker Oats to receive any federal contracts, or funding into the near future.

**4.     On the Second Cause of Action:**

(a) For actual, statutory, compensatory and punitive damages in an amount to be determined according to proof, but in no event less than **$2 Billion Dollars ($2,000,000,000.00),** plus interest, a future royalty, and equity stock thereon at the maximum rate allowed by law;

(b) For punitive and exemplary damages in an amount to be determined at trial pursuant to Sect. 51, Minnesota Statutes   §325A.09 for Remedies and Enforcement

Remedies, NY Code - Article 5, Title 13, and/or 35.01 Punitive/Exemplary Damages--
Willful and Wanton Conduct, and Statutes 735 ILCS 5 Code of Civil Procedure. Section
2-604.1, http://codes.lp.findlaw.com/nycode/GOB/5

**5.    On the Third Cause of Action:**

(a) For actual, statutory, compensatory and punitive damages in an amount to be
determined according to proof, but in no event less than **$2 Billion Dollars
($2,000,000,000.00),** plus interest, a future royalty, and equity stock thereon at the
maximum rate allowed by law;

(b) For punitive and exemplary damages in an amount to be determined at trial
pursuant to Sect. 51, Minnesota Statutes §325A.09 for Remedies and Enforcement
Remedies, NY Code - Article 5, Title 13, and/or 35.01 Punitive/Exemplary Damages--
Willful and Wanton Conduct, and Statutes 735 ILCS 5 Code of Civil Procedure. Section
2-604.1.

**6.    On the Fourth Cause of Action:**

(a) (For actual, statutory, compensatory and punitive damages in an amount to be
determined according to proof, but in no event less than **$2 Billion Dollars
(2,000,000,000.00),** plus interest, a future royalty, and equity stock thereon at the
maximum rate allowed by law;

(b) For punitive and exemplary damages in an amount to be determined at trial
pursuant to Minnesota Statutes §325A.09 for Remedies and Enforcement Remedies, NY
Code - Article 5, Title 13, and/or 35.01 Punitive/Exemplary Damages--Willful and
Wanton Conduct, and Statutes 735 ILCS 5 Code of Civil Procedure. Section 2-604.1.

**7.    On the Fifth Cause of Action:**

(a) (For actual, statutory, compensatory and punitive damages in an amount to be
determined according to proof, but in no event less than **$2 Billion Dollars
($2,000,000,000.00),** plus interest thereon at the maximum rate allowed by law;

(b) For punitive and exemplary damages in an amount to be determined at trial
pursuant to Sect. 51, Minnesota Statutes 325A.09 for Remedies and Enforcement
Remedies, NY Code - Article 5, Title 13, and/or 35.01 Punitive/Exemplary Damages--

Willful and Wanton Conduct, and Statutes 735 ILCS 5 Code of Civil Procedure. Section 2-604.1 .

**8.    On the Sixth Cause of Action:**

(a) (For actual, statutory, compensatory and punitive damages in an amount to be determined according to proof, but in no event less than **$2 Billion Dollars ($2,000,000,000.00),** plus interest thereon at the maximum rate allowed by law;

(b) For punitive and exemplary damages in an amount to be determined at trial pursuant to Sect. 51, Minnesota Statutes §325A.09 for Remedies and Enforcement Remedies, NY Code - Article 5, Title 13, and/or 35.01 Punitive/Exemplary Damages-- Willful and Wanton Conduct, and Statutes 735 ILCS 5 Code of Civil Procedure. Section 2-604.1.

**9.    On the Seventh Cause of Action:**

(a) (For actual, statutory, compensatory and punitive damages in an amount to be determined according to proof, but in no event less than **$2 Billion Dollars ($2,000,000,000.00),** plus interest thereon at the maximum rate allowed by law;

(b) For punitive and exemplary damages in an amount to be determined at trial pursuant to Sect. 51, Minnesota Statutes §325A.09 for Remedies and Enforcement Remedies, NY Code - Article 5, Title 13, and/or 35.01 Punitive/Exemplary Damages-- Willful and Wanton Conduct, and Statutes 735 ILCS 5 Code of Civil Procedure. Section 2-604.1.

**10.    On the Eighth Cause of Action:**

(a) (For actual, statutory, compensatory and punitive damages in an amount to be determined according to proof, but in no event less than **$2 Billion Dollars ($2,000,000,000.00)**, plus interest thereon at the maximum rate allowed by law;

(b) For punitive and exemplary damages in an amount to be determined at trial pursuant to Sect. 51, Minnesota Statutes §325A.09 for Remedies and Enforcement Remedies, NY Code - Article 5, Title 13, and/or 35.01 Punitive/Exemplary Damages-- Willful and Wanton Conduct, and Statutes 735 ILCS 5 Code of Civil Procedure. Section 2-604.1 .

**11.   On the Ninth Cause of Action:**

(a) (For actual, statutory, compensatory and punitive damages in an amount to be determined according to proof, but in no event less than **$2 Billion Dollars ($2,000,000,000.00),** plus interest thereon at the maximum rate allowed by law;

(b) For punitive, compensatory and exemplary damages in an amount to be determined at trial pursuant to Sect. 51, Minnesota Statutes §325A.09 for Remedies and Enforcement Remedies, NY Code - Article 5, Title 13, and/or 35.01 Punitive/Exemplary Damages--Willful and Wanton Conduct, and Statutes 735 ILCS 5 Code of Civil Procedure. Section 2-604.1

**12.   On the Tenth Cause of Action:**

(a) (For actual, statutory, compensatory and punitive damages in an amount to be determined according to proof, but in no event less than **$2 Billion Dollars ($2,000,000,000.00),** plus interest thereon at the maximum rate allowed by law;

(b) For punitive, compensatory and exemplary damages in an amount to be determined at trial pursuant to Sect. 51, Minnesota Statutes §325A.09 for Remedies and Enforcement Remedies, NY Code - Article 5, Title 13, and/or 35.01 Punitive/Exemplary Damages--Willful and Wanton Conduct, and Statutes 735 ILCS 5 Code of Civil Procedure. Section 2-604.1 .

**13.   On the Eleventh Cause of Action:**

(a) (For actual, statutory, compensatory and punitive damages in an amount to be determined according to proof, but in no event less than **$2 Billion Dollars ($2,000,000,000.00),** plus interest thereon at the maximum rate allowed by law;

(b) For punitive, compensatory and exemplary damages in an amount to be determined at trial pursuant to Sect. 51, Minnesota Statutes §325A.09 for Remedies and Enforcement Remedies, NY Code - Article 5, Title 13, and/or 35.01 Punitive/Exemplary Damages--Willful and Wanton Conduct, and Statutes 735 ILCS 5 Code of Civil Procedure. Section 2-604.1.

**14.   On the Twelfth Cause of Action:**

(a) (For actual, statutory, compensatory and punitive damages in an amount to be determined according to proof, but in no event less than **$2 Billion Dollars ($2,000,000,000.00)**, plus interest thereon at the maximum rate allowed by law;

(b) For punitive and exemplary damages in an amount to be determined at trial pursuant to Sect. 51, Minnesota Statutes §325A.09 for Remedies and Enforcement Remedies, NY Code - Article 5, Title 13, and/or 35.01 Punitive/Exemplary Damages-- Willful and Wanton Conduct, and Statutes 735 ILCS 5 Code of Civil Procedure. Section 2-604.1.

**15.** **On all causes of Action:**

    a. For Costs of suit incurred herein;

    b. For interest as allowed by law; and

    c. For such other and further relief as the Court may be just and proper.

**16.** **This Civil Complaint is hereby filed**

**17.** **JURY TRIAL IS DEMANDED**

    (a) Plaintiffs Harrington Class demands a trial by jury on all issues triable of right by jury

DATED: **08 /13/ 2014**      **D.W.H., GREAT GRANDSON FOR THE ESTATE OF ANNA. S. HARRINGTON**

By: _D. W. Hunter_

**L. E., JR. GREAT GRANDSON FOR THE ESTATE OF ANNA. S. HARRINGTON**

By: _Laine E. Evans Jr_

# Exh. 1

**New York State Department of Health**
OFFICE OF VITAL STATISTICS
**CERTIFICATE OF DEATH**

Dist. No.
To be inserted by registrar

Registered No.

THIS CERTIFICATE MUST BE FILED WITH THE LOCAL REGISTRAR WITHIN 72 HOURS AFTER DEATH.
TYPEWRITE, HAND-PRINT, OR WRITE LEGIBLY IN PERMANENT BLACK OR BLUE-BLACK INK.
PENCILS, COLORED INKS, OR BALLPOINT PENS SHOULD NEVER BE USED. SIGNATURES SHOULD
BE LEGIBLE. THIS IS A PERMANENT RECORD.

Form VS No. 60b.   1-23-54-2750 Books (3C-156)    MARGIN RESERVED FOR BINDING

(See Reverse for Instructions)

1. PLACE OF DEATH: STATE OF NEW YORK
a. COUNTY Onondaga

2. USUAL RESIDENCE (Where deceased lived. If institution: residence before death)
a. STATE New York   b. COUNTY Onondaga

b. TOWN
e. LENGTH OF STAY IN TOWN, CITY OR VILLAGE
c. TOWN

c. CITY OR VILLAGE Syracuse    26 years

d. CITY OR VILLAGE Syracuse    Is residence within its corporate limits? YES ☐ NO ☐

d. NAME OF HOSPITAL OR INSTITUTION (If not in hospital or institution give street address or location) Street

e. STREET ADDRESS Street

3. NAME OF DECEASED (Type or Print) Anna Harrington

4. DATE OF DEATH (Month) October 21, (Day) (Year) 1955

5. SEX Female

6. COLOR OR RACE Colored

7. SINGLE, MARRIED, WIDOWED, DIVORCED (Specify) Widowed

8. IF MARRIED, WIDOWED OR DIVORCED, Name of Husband (or) Wife John Henry Harrington

9. DATE OF BIRTH L   /97

10. AGE Years 58   Months 8   Days 22

If UNDER 24 HRS. Hours   Min.

11. BIRTHPLACE (State or foreign country) Bennettville, S.C.

12. CITIZEN OF WHAT COUNTRY? U.S.

13a. USUAL OCCUPATION (Give kind of work done during most of working life, even if retired) Cook, demonstrator

13b. KIND OF BUSINESS OR INDUSTRY Quaker Oats Company

14. FATHER'S NAME D        Short

15. MOTHER'S MAIDEN NAME

16. WAS DECEASED EVER IN U.S. ARMED FORCES? (Yes, no, or unknown) (If yes, give war or dates of service) No   None

17. SOCIAL SECURITY NO.

17. INFORMANT'S NAME Laura Patterson

| MEDICAL CERTIFICATION | 19. | CAUSE OF DEATH | INTERVAL BETWEEN ONSET AND DEATH |
|---|---|---|---|
| | DISEASE OR CONDITION DIRECTLY LEADING TO DEATH (This does not mean the mode of dying, e.g., heart failure, asthenia, etc. It means the disease, injury or complication which caused death.) | (A) Arterio sclerotic heart | sudde... |
| | ANTECEDENT CAUSES DISEASES OR CONDITIONS, if any, giving rise to the above cause (A) stating the UNDERLYING CONDITION last. | (B) DUE TO disease | |
| | | (C) | |
| | OTHER SIGNIFICANT CONDITIONS contributing to the death, but not related to the disease or condition causing it. | | |

| 20a. DATE OF OPERATION | 20b. MAJOR FINDINGS OF OPERATION | 21. AUTOPSY? YES ☐ NO ☒ |
|---|---|---|

| 22a. ACCIDENT, SUICIDE, HOMICIDE (Specify) | 22b. PLACE OF INJURY (e.g., in or about home, farm, factory, street, office bldg., etc.) | 22c. WHERE DID INJURY OCCUR? (City or town) (County) (State) |
|---|---|---|

| 22d. TIME (Month) (Day) (Year) (Hour) m. | 22e. INJURY OCCURRED While at Work ☐ Not While at Work ☐ | 22f. HOW DID INJURY OCCUR? |
|---|---|---|

23. I hereby certify that I attended the deceased from................, 19......, to................, 19......, that I last saw the deceased alive on................, 19......, and that death occurred at..........m., from the causes and on the date stated above.

| 24a. | 24b. ADDRESS | 24c. DATE SIGNED |
|---|---|---|

26a. Cemetery Syracuse, New York
26b. DATE Oc        1955

27. DATE FILED    OCT

Burial or Transit } Permit issued b

Exh. 1



THIS IS TO CERTIFY THAT THE FOREGOING IS A TRUE COPY OF A RECORD ON FILE IN THE OFFICE OF VITAL STATISTICS, ONONDAGA COUNTY HEALTH DEPARTMENT, SYRACUSE, N.Y. DO NOT ACCEPT THIS COPY UNLESS THE RAISED SEAL OF THE ONONDAGA COUNTY HEALTH DEPARTMENT IS AFFIXED THEREON.

2014

DATE OF ISSUANCE

Interim

Commissioner of Health

Exh. 1



ANN SHORT HARRINGTON (1897-1955)

Exh. 2

# Pinnacle Foods

★★★☆☆ 2.8 of 5 – 77 reviews

| | |
|---|---|
| Website | www.pinnaclefoods.com |
| Headquarters | Parsippany, NJ |
| Size | 1000 to 5000 Employees |
| Type | Company - Public (PF) |
| Industry | Manufacturing |
| Revenue | $2 to $5 billion (USD) per year |
| Competitors | General Mills, ConAgra Foods, Smucker |

In more than 85% of American households, consumers reach for Pinnacle Foods brands. Pinnacle Foods is a Top 1000 Company ranked on Fortune Magazine's 2013 Top 1000 companies list. We are a leading producer, marketer and distributor of high-quality branded food products, which have been trusted household names for decades. Headquartered in Parsippany, NJ, our business employs an average of 4,400 employees. We are a leader in the shelf stable and frozen foods segments and our brands hold the #1 or #2 market position in 10 of the 12 major categories in which they compete. Further information is available at http://www.pinnaclefoods.com.

**Mission**: Reinvigorating Iconic Brands

Exh. 3



# Funeral Services
## for
## Olivia Hunter

Saturday, December 5, 1992 at 10:00 a.m.

**Bellgrove Missionary Baptist Church**
219 West Castle Street

*Rev. Joseph H. Carter, Pastor*

Exh. 1⊠

Exh. 4

May 11, 1923

# Obituary

Mrs. Olivia Hunter, 69, died Monday, November 30, 1992 at her home at 346 Furman Street, Syracuse, New York.

Mrs. Hunter was the youngest daughter of <u>Anna S. Harrington</u> who for over 15 years was the representative as a demonstrator and in commercials for the Quaker Oats Company as Aunt Jemima and whose picture appeared on their pancake mix.

Mrs. Hunter was born in Bennettsville, South Carolina May 13, 1923. She came to Syracuse in 1930 with her mother and five brothers and sisters.

Mrs. Hunter worked for many years as a cook for several fraternity houses at Syracuse University, following in her mother's footsteps.

Mrs. Hunter was a licensed foster mother in N.Y.S. and also in the state of Florida. Mrs. Hunter moved to Florida in 1969 and lived in Sanford, Florida for the next 20 years, managing McAllisters Hotel in Sanford, as well as raising foster children. She returned to Syracuse in 1989. Her daughter Elizabeth estimates that her mother raised in excess of 30 foster children in the last 25 years and said that some still consider her their "mother".

Mrs. Hunter was a life member of Queen of Sheba, chapter 268 of the International Order of Eastern Stars.

Surviving are her husband, Emitt Jimmie Hunter; two daughters Elizabeth Hunter and Louise Solomon, both of Syracuse. Her son Daniel died in 1982. Also surviving are her sister Mrs. Laura Mae Sizemore of Syracuse, her brother Levi Harrington of Sanford, Florida; her aunt Lila Davis of Rockingham, North Carolina; nine grandchildren, 15 great grandchildren, and one great-great grandchild.



Exh. 5



Exh.6

# Mrs. Harrington Dies; 'Aunt Jemima' of Area

Funeral services will be held at 1:30 p.m. Tuesday for Mrs. Anna Harrington, 58, of 117 Monroe St., who became widely known throughout Central New York as a demonstrator for Aunt Jemima pancake flour. She died Friday at her home following a short illness.

Services will be from her home at 1:30 p.m. and in Bethany Baptist Church at 2 p.m. Burial will be in Morningside Cemetery.

A native of Bennettsville, S. C., Mrs. Harrington had lived in Syracuse for 25 years. As a demonstrator for the pancake concern, she appeared for many years at the New York State Fair.

Surviving are three daughters, Mrs. Laura Patterson, Mrs. Delores Hoffman and Mrs. Olivia Hunter, all of Syracuse; two sons, Levi and Daniel, both of Syracuse; four brothers, John, Samuel, Daniel and Ernest Short, all of South Carolina; three sisters, Mrs. Titolla Bloomfield and Mrs. Lila Davis, both of Rockingham, N. C., and Mrs. Bessie Savannah of Bennettsville, S. C.; three grandchildren; two great-grandchildren; several nieces and nephews.

Calling hours at the home are today after 7 p.m. and on Monday.

52

Exh. 7

**B**ehind the happily smiling face beneath the colorful bandanna is an artist's drawing of the late Ann Short Harrington, a real person and a native South Carolinian.

Born to Daniel and Lila Short, who lived on the Claudius Pegues farm in what is now the Wallace Community in Marlboro County, Ann was one of eleven children—six girls and five boys. Her only surviving sister, Lila Short Davis, is now a resident of Rockingham and was recently interviewed for an article in the Richmond County Daily Journal.

Mrs. Davis, 86, says the family moved into North Carolina when Ann was 12. They spent the next fourteen years on the Will Everett farm below Everett Mill. During that time, the children attended school two miles away, across the state line in South Carolina, at a small school which was church sponsored. They walked the two miles to school, which was in session from November through March or April.

Ann Short quit school before she reached seventh grade, according to her sister. In 1921, she married Weldon Harrington. They had five children. Then Harrington "got into some trouble" and left her.

Faced with the necessity to support her five children, Ann Short Harrington moved North in 1932. She settled in Syracuse, New York. Mrs. Davis has fond memories of Ann. She also is aware of Ann's courage and determination. "She did everything—sewing and cooking," to provide for her family, Lila Davis says.

Ann Short Harrington's fame was launched at a fairground in the Syracuse area in 1935. She was cooking pancakes there when she was discovered by the Quaker Oats Company, her picture drawn, and her image publicized as "Aunt Jemima."

Mrs. Harrington was paid good money for traveling around the nation making personal appearances as Aunt Jemima.

In November 1935, "Aunt Jemima's" likeness appeared in an ad in Woman's Home Companion. The headline capitalized on her Southern accent "Let ol' Auntie sing a song in yo' kitchen." It went on "Make meal-time an adventure with Aunt Jemima's Magic Menu, ham 'n' waffles, Southern style."

A coupon offered free (with one box top) "Aunt Jemima's Album of Secret Recipes," containing 64 of her recipes and 22 complete menus.

In a Syracuse, New York, newspaper article in May 1975, the public was informed that "Aunt Jemima's" former employers were "a string of Governors of Virginia who enjoyed her Southern cooking as much as their northern counterpart Thomas E. Dewey later did. In the summer she spent much of her time filling the stomachs of Senator Taft and his family."

The article continues, apparently referring to her having worked as cook for a university fraternity house: "Aunt Jemima worked at the Sammy House for two years and one of her toughest chores, she says, was feeding basketball player Eddie Miller. One morning he ate no less than three dozen hot buns. After that episode, she stopped counting and kept cooking."

"Whether Miller tired her out or the Sammies ate too much, no one knows, but at any rate Mrs. Harrington left Sammy for Sig Ep and then moved over to the Kappa Sig house."

Mrs. Harrington developed her own recipe for keeping her waistline down and the pancake consumption up. She used potato grease on the skillet instead of butter. "That was probably the first time in history that potatoes weren't considered farming."

During the 14 years that Mrs. Short worked as Aunt Jemima, she made enough money not only to provide for her children but also to buy a 22-room house with a bungalow behind it.

Mrs. Davis visited her famous sister by train five times in Syracuse. She was taken on tours into Canada twice while visiting.

The day before Mrs. Harrington's death in 1955, one of her brothers arrived in Syracuse driving a truck. He spent the night at her house. She gave him her own bedroom and slept in the "showcase room."

When she did not appear for breakfast, the brother went to look for her. She was dead at 55, having seemingly passed away peacefully in her sleep. The cause may have been heart disease complicated by diabetes.

Mrs. Davis was reached by phone through the Pegues plantation. She took the long trip to Syracuse by bus to attend the funeral.

Relatives of Mrs. Harrington who still live in Marlboro County include nieces Lee Nora Pegues, Lila Bennett, and Mildred Foster, a nephew Adam Harrington, and a cousin "Bo" Leak of the New Hope Section.

**Exh. 8**

Anna Short Harrington was buried in Oakwood Cemetery in Syracuse, at grave plot number 63-section H-4. Many of her relatives continue to live in the Wallace Community. Lenora Pegues is still proud of her famous aunt.

44

**Exh. 9**



51

Exh. 10



Exh. 11



**Exh. 12**



**Exh.13**



Exh.14

1
2
3



19
20
21
22
23
24
25
26
27
28

**Exh.15**





**Exh.15**



**Exh.16**

## Memorial Bronze

**JAS. H. MATTHEWS & CO., 1315 WEST LIBERTY AVENUE, PITTSBURGH 26, PENNSYLVANIA**

**ORDER FORM**

Ordered by _Oliver Tupater_  Address _15 Beede St_

Section Owner_____  Address_____

Block_____  Section _H 4_  Lot No._____  Grave No. _65_

Date Ordered by Purchaser_____  Date Desired Set_____  Price_____

| DESIGN OF MEMORIAL | Rockedge | Beveledge | Hammered Tolee | SIZE |
|---|---|---|---|---|
| OAKLAWN #1 | ✓ | | | 13 x - |

| MEMORIAL Only ✓ | MEMORIAL Vase Combination / One Vase  Two Vases | Hammered Dorie Vase | Plain Dorie Vase | 1 Vase | 2 Vase | Dise | FINISH / Light  Dark |

| LETTER STYLE | | TO MATCH MEMORIAL |
|---|---|---|
| Oval Face  Hat Face  ✕ | Name On memorial | |
| | Received by Cutery  MO   YEAR | |

**INSCRIPTION**  EMBLEM (if any)

ANNA HARRINGTON

1897 - 1955

| SEPARATE VASE UNITS WITH VASE BASE RING | | | | | | LOT MARKERS | Site | Direction |
|---|---|---|---|---|---|---|---|---|

Oakwood Cemetery  1955
740 Oakwood Avenue  31
Syracuse, New York

53

**Exh.17**



**Exh.18**

# Aunt Jemima

From Free net encyclopedia

# http://www.netipedia.com/index.php/Aunt_Jemima

Image:Aunt Jemima Logo.jpgs

**Aunt Jemima** is a trademark for pancake flour, syrup, and other breakfast foods. The trademark dates to 1893, although Aunt Jemima pancake mix debuted in 1889. Quaker Oats bought the brand in 1926. Aunt Jemima frozen products were licensed out to Pinnacle Foods Corporation in 1996.

The impetus for Aunt Jemima comes from a minstrelsy/vaudeville song of the same name. Chris L. Rutt of the Pearl Milling Company saw the song being sung by blackface performers Baker & Farrell wearing an apron and kerchief, and appropriated the character.

Aunt Jemima is depicted as a plump, smiling, bright-eyed black woman, originally wearing a kerchief over her hair. Originally, she was represented as a slave and was the most commonplace representation of the stereotypical "mammy" character.

## The woman whose likeness was painted for the logo was Anna Short Harrington.
However, to many people, Aunt Jemima was the ebullient Nancy Green, born a slave in Montgomery County, Kentucky, who was hired by R.T. Davis Milling Company to play the Jemima character from 1890 to her death in 1924. Green, as Jemima, operated a pancake-cooking display at the World's Columbian Exposition in Chicago, Illinois during 1893, beside the "world's largest flour barrel". Harriette Widmer also portrayed the character on radio.

**Exh.19**

81

Aunt Jemima was not the only depiction of a black person to be used in early advertising. Often distorted images of blacks were featured prominently as trademarks of several products. Most commonly, such images were used to sell food, cleaning agents, agricultural produce, and products that were black or brown, such as coffee, ink, and chocolate. Examples include Cream of Wheat, featuring a cook named "Rastus" (the word itself a racial slur); Fairbank's Gold Dust, a powdered laundry detergent, featuring the "Gold Dust Twins"; J & P Coat's Threads, featuring "Topsy" and "Mammy" cookie jars. Objections to the depiction of Aunt Jemima and other black advertising date back to the 1920s. One important characteristic of the Aunt Jemima trademark is its stereotypical depiction of black women as servants. Aunt Jemima was characteristic of most advertising with black women as a reminder that their place was in the kitchen, and the majority of advertising was associated with food. Many blacks found Aunt Jemima in particular to be an obvious and insensitive reminder of slavery.

An early advertisement, for example, contained the following copy: Image:AuntJemima.jpg

> On the old plantation, Aunt Jemima refused to reveal to a soul the secret of those light fragrant pancakes which she baked for her master and his guests. Only once, long after her master's death did Aunt Jemima reveal her recipe. It's still a secret.

The phrase "Aunt Jemima" is sometimes used as a female version of Uncle Tom to refer to a black woman who is obsequiously servile.

The 1950s television show *Beulah* came under fire for depicting a mammy-like black maid and cook who was somewhat reminiscent of Aunt Jemima. Today, "Beulah" and "Aunt Jemima" are more or less interchangeable as terms of disparagement.

The Aunt Jemima trademark has been modified several times over the years. Aunt Jemima is no longer a slave, but either a housewife or some other benevolent mother figure. She has been made younger and more physically attractive, and her kerchief has been eliminated for a more modern hairstyle and pearls. This new look remains with the products to this day.

4

**Exh.20**

82

## ECONOMIC ESPIONAGE AND FRAUD

Date: Thu, 6 Mar 2014 12:41:47 -0800

Subject: Fwd: ▮▮▮▮ Hunter

From: ▮▮▮▮@gmail.com

To: ▮▮▮▮@yahoo.com;
▮▮▮▮@hotmail.com

---------- Forwarded message ----------
From: <**Vital Statistic Orders%ONGOV@ongov.net**>
Date: Thu, Mar 6, 2014 at 12:39 PM
Subject: Re: Dannez Hunter
To: R▮▮▮▮ <r▮▮▮▮@gmail.com>


Per our phone conversation I have a couple of
suggestions for Mr Hunter
1) áPurchase a genealogy copy. áIt has all of
the same information on it as
a certified copy.
2) Have his litigation attorney send a request
on his letterhead. áIn the body of the letter
he/she should give the decedents name and date
of death and state that the document is needed
for a legal procedure and who they are
representing (also if they could include why
the certificate is required for the procedure
it would be helpful **because the attorney
is supposed to be representing a
legally entitled party which Mr
Hunter is not**).

# Exh. 21

83

áThe letter must be signed by the attorney and a copy of their bar
association/court ID enclosed along with a copy of their driver's license
and company check for $30.

3) As we are governed by New York State Public Health Laws and New York State Policy and Procedures, Mr Hunter may want to try contacting New York State Vital Records at 1-855-322-1022. áTheir mailing address is Department of Health, Vital Records Section, P.O. Box 2602, Albany, NY 12220-2602.

If you have any questions, please feel free to contact me. áThank you for your help.

**Exh. 22**



## Marlboro County
### RESOURCE GUIDE

Bennettsville
Blenheim
Clio
McColl
Tatum
Wallace

# Exh. 23

15                                                    HISTORY

## Important Sons and Daughters of Marlboro County

Several famous Marlboro County natives include United States Congressman and diplomat Robert Blair Campbell (1791-1862), United States and Confederate Congressman John McQueen (1804-1867), nationally known children's advocate Marian Wright Edelman and former Bank of America chairman Hugh L. McColl Jr.

The last "Aunt Jemima" for Quaker Oats Cereals was Annie Short Harrington from Marlboro County. She was discovered by the Quaker Oats Company in 1935 at a fairground in Syracuse, NY, while cooking pancakes.

Mason Lee was born in 1770 in Marlboro County and struck by lightening at age 30. Thereafter he became obsessed with witches and the devil. He slept in a hollowed out gum log that is on display at the Marlboro County Historical Museum. He left a large estate of $50,000 (equal to $935,791 in 2009 dollars) to the states of South Carolina and Tennessee. The trial contesting his will and the subsequent ruling in this landmark case established standards for determining mental capacity studied in leading law schools both here and abroad. The will is on display at the museum and the only historic marker in South Carolina to a will is located on Route 38 near the Bristow community.

## Fast Facts About Marlboro County

Bennettsville was named the first G.R.E.A.T. (Governor's Rural Economic Achievement Trophy) Town in 1979.

Courthouse Square is the largest in the state and has been beautifully restored.

Founded in 1819, Bennettsville was occupied by Union troops in March 1865.

Sherman spared the courthouse, making it one of South Carolina's few county seats with records accessible for genealogical research dating back to 1785.

Bennettsville's master plan in South Carolina, done by the internationally known firm of Duany, Plater-Zyberk, was completed in 1997.

The Bennettsville Visitor Center was recognized with a Municipal Achievement Award by the Main Street South Carolina program of the Municipal Association of South Carolina.

**Exh. 24**

**PEGUES PLACE HISTORICAL MARKER
ON HIGHWAY US 1.**

**Exh.24**

49

**PEPSICO**

Who We Are    What We Believe    Brands You Love    Investors

6/19/2014 : SHARE

PURCHASE, N.Y., June 19, 2014 /PRNewswire/ -- PepsiCo, Inc. (NYSE: PEP) today announced that its second quarter 2014 earnings conference call for investors and financial analysts will be webcast on Wednesday, July 23, 2014 at 8 a.m. Eastern Daylight Time (EDT) at www.pepsico.com in the "Investors" section under "Events and Presentations."



# PEPSICO

  

The Company will issue its financial results at approximately 7 a.m. EDT that morning.

**About PepsiCo**
PepsiCo products are enjoyed by consumers one billion times a day in more than 200 countries and territories around the world. PepsiCo generated more than $66 billion in net revenue in 2013, driven by a complementary food and beverage portfolio that includes Frito-Lay, Gatorade, Pepsi-Cola, Quaker and Tropicana. PepsiCo's product portfolio includes a wide range of enjoyable foods and beverages, including 22 brands that generate more than $1 billion each in estimated annual retail sales.

At the heart of PepsiCo is Performance with Purpose – our goal to deliver top-tier financial performance while creating sustainable growth in shareholder value. In practice, Performance with Purpose means providing a wide range of foods and beverages from treats to healthy eats; finding innovative ways to minimize our impact on the environment and reduce our operating costs; providing a safe and inclusive workplace for our employees globally; and respecting, supporting and investing in the local communities where we operate. For more information, visit www.pepsico.com.

Photo - http://photos.prnewswire.com/prnh/20140416/73233

SOURCE PepsiCo

Previous                                                                                    Next

**Exh.25**

# Pinnacle Foods Finance LLC Reports Fourth Quarter Fiscal 2012 Results....

**Parsippany, N.J. (March 6, 2013)** -- Pinnacle Foods Finance LLC today announced its financial results for the fourth quarter and fiscal year ended December 30, 2012. Net sales for the quarter increased 3% versus year-ago to $705 million, and net earnings in the quarter were $44 million, after giving effect to approximately $10 million of after-tax charges, primarily related to restructuring. For 2012, net sales of $2.48 billion were essentially even with year-ago, and net earnings were $53 million, after giving effect to approximately $51 million of after-tax charges, principally related to restructuring and refinancing.

http://pinnaclefoods.com/investors/news/pinnacle-foods-finance-llc-reports-fourth-quarter-fiscal-2012-results

Commenting on the results, Pinnacle Foods Chief Executive Officer Bob Gamgort stated, "We posted solid performance in the fourth quarter by delivering a 3% increase in adjusted EBITDA. In a food industry environment that is showing some signs of improving, we generated share growth on more than half of our portfolio, driving 4% net sales growth on our North America retail business. Further, we expanded gross margin, excluding restructuring, as inflation moderated and our productivity initiatives accelerated."

## Fourth Quarter 2012

Net sales of $705 million in the fourth quarter of 2012 increased 3%, compared to net sales of $686 million in the year-ago period. This performance reflected the benefit of a 53rd week in 2012 which added approximately 4% for the quarter, as well as favorable mix, partially offset by the impact of the Company's exit from lower-margin businesses in its Specialty Division.

Net sales in the Company's North America retail businesses increased 4% in the quarter, largely reflecting the 53rd week in 2012. By brand, the Company registered sales growth for Birds Eye® Voila!™, Van de Kamp's® and Mrs. Paul's® frozen seafood, Vlasic® pickles and Log Cabin® syrups, while net sales of Birds Eye® vegetables, Duncan Hines® baking products and Aunt Jemima® frozen breakfasts declined.

Adjusted EBITDA, as defined in the Company's borrowing agreements, advanced 3% to $153 million in the fourth quarter of 2012, compared to Adjusted EBITDA of $149 million in the year-ago quarter. Adjusted EBITDA is defined below under "Non-GAAP Financial Measures" and is reconciled to Net Earnings (Loss) in the tables that accompany this release.

**Exh.26**

Earnings before interest and taxes (EBIT) were $117 million in the fourth quarter of 2012, after giving effect to $16 million of pre-tax charges primarily related to restructuring, compared to a loss at the EBIT line in the fourth quarter of 2011 of $(26) million, which included $155 million of pre-tax charges primarily related to goodwill and tradename impairments. Excluding these charges in both periods, EBIT for the quarter improved 3% versus year-ago to $133 million. This improved performance resulted from strong productivity results and moderating inflation. Also, the 53rd week increased the comparison by approximately 4%. Partially offsetting these improvements was lower performance-based compensation expense in 2011. Excluding the two items from both years, adjusted EBIT increased 5%.

The Company reported net earnings of $44 million in the fourth quarter of 2012, after giving effect to approximately $10 million of after-tax charges primarily related to restructuring, compared to a net loss of $(88) million in the fourth quarter of 2011, which included $133 million of after-tax charges primarily related to goodwill and tradename impairments. Excluding these charges in both periods, net earnings advanced 17% to $54 million in the fourth quarter of 2012, compared to approximately $46 million in the year-ago quarter. This improvement reflected the increase in EBIT, as well as lower interest expense, stemming from the Company's refinancing activities and lower overall debt levels.

## **Fiscal Year 2012**

Net sales of $2.48 billion in 2012 were essentially even with net sales of $2.47 billion in 2011. Net sales in the Company's North America retail businesses increased 1% to $2.08 billion in 2012, compared to net sales of $2.07 billion in the year-ago period. The 53rd week in 2012 benefited both the consolidated and the North America retail net sales comparisons by approximately 1%.

Adjusted EBITDA was $426 million in the fiscal year 2012, compared to Adjusted EBITDA of $450 million in 2011.

EBIT in 2012 was $284 million, after giving effect to $66 million in pre-tax charges principally related to restructuring and refinancing, compared to EBIT in the year-ago period of $183 million, which included $192 million in pre-tax charges primarily related to impairments, restructuring and a legal settlement.

Net earnings in 2012 were $53 million, after giving effect to $51 million in after-tax charges, primarily related to restructuring and refinancing compared to a net loss in 2011 of $(47) million, which included $156 million of after-tax charges, primarily related to impairments, restructuring and a legal settlement.

**Exh.27**

Net cash provided by operating activities in 2012 was $203 million, compared to net cash provided by operating activities of $204 million in the year-ago period. Total capital expenditures, including footprint consolidation, were $78 million in 2012 compared to $117 million in 2011. Ongoing capital expenditures, excluding footprint consolidation, were $70 million in 2012 and $88 million in 2011.

## Conference Call Information

The Company will host a conference call on Wednesday, March 6, 2013 at 10:00AM (ET) to discuss its results, although the call this quarter will not include the usual question and answer session due to the Pinnacle Foods Inc. Registration Statement filing on December 19, 2012.

To access the call, interested parties can dial (866) 835-8903 and reference conference name: Pinnacle Foods Q4 Earnings Call. A replay of the call will be available, beginning March 6, 2013 at 1:00 PM (ET) until March 20, 2013, by dialing 1-888-266-2081 and referencing Access Code 1606400.

## About Pinnacle Foods Finance LLC

Millions of times a day in more than 85% of American households, consumers reach for Pinnacle Foods brands. Pinnacle Foods is a Top 1000 Company ranked on Fortune Magazine's 2011 Top 1000 companies list. We are a leading producer, marketer and distributor of high-quality branded food products, which have been trusted household names for decades. Headquartered in Parsippany, NJ, our business employs an average of 4,400 employees. We are a leader in the shelf stable and frozen foods segments and our brands hold the #1 or #2 market position in 10 out of 12 major category segments in which they compete. Our Duncan Hines Grocery Division manages Leadership brands such as Duncan Hines® baking mixes and frostings, Vlasic® shelf-stable pickles and Mrs. Butterworth's® and Log Cabin® table syrups and Foundation brands such as Armour® canned meats, Brooks® and Nalley® chili and chili ingredients, Comstock® and Wilderness® pie and pastry fruit fillings and Open Pit® barbecue sauces. Our Birds Eye Frozen Division manages Leadership brands such as Birds Eye®, Birds Eye Steamfresh®, C&W®, McKenzie's®, and Fresh like® vegetables, Birds Eye Voila!® complete bagged meals and Van de Kamp's® and Mrs. Paul's® seafood and Foundation brands such as Hungry-Man® dinners and entrées, Aunt Jemima® frozen breakfasts, Lender's® bagels, and Celeste® pizza. Our Specialty Foods Division manages Tim's Cascade Snacks®, Hawaiian® Kettle Style Potato Chips, Erin's® Popcorn, Snyder of Berlin® and Husman's® in addition to our food service and private label businesses. Further information is available at http://www.pinnaclefoods.com.

**Exh.28**

Contact:

Maria Sceppaguercio

SVP, Investor Relations

Pinnacle Foods Finance LLC

973-541-8629

## **Forward Looking Statements**

This release may contain statements that predict or forecast future events or results, depend on future events for their accuracy or otherwise contain "forward-looking information." The words "estimates," "expects," "contemplates," "anticipates," "projects," "plans," "intends," "believes," "forecasts," "may," "should," and variations of such words or similar expressions are intended to identify forward-looking statements. These statements are made based on management's current expectations and beliefs concerning future events and various assumptions and are not guarantees of future performance. Actual results may differ materially as a result of various factors, some of which are beyond our control, including but not limited to: general economic and business conditions, deterioration of the credit and capital markets, industry trends, our substantial leverage and changes in our leverage, interest rate changes, changes in our ownership structure, competition, the loss of any of our major customers or suppliers, changes in demand for our products, changes in distribution channels or competitive conditions in the markets where we operate, costs of integrating acquisitions, the successful integration and achievement of estimated future cost savings related to the Birds Eye Foods acquisition, loss of our intellectual property rights, fluctuations in price and supply of raw materials, seasonality, our reliance on co-packers to meet our manufacturing needs, availability of qualified personnel, changes in the cost of compliance with laws and regulations, including environmental laws and regulations, and the other risks and uncertainties detailed in our Annual Report on Form 10-K for the year ended December 30, 2012 and subsequent reports filed with the Securities and Exchange Commission. There may be other factors that may cause our actual results to differ materially from the forward-looking statements.  We assume no obligation to update the information contained in the presentation.

**Exh.29**



2012 PEPSICO **ANNUAL REPORT**

FINANCIAL HIGHLIGHTS

# Financial Highlights

**Cumulative Total Shareholder Return**

Return on PepsiCo stock investment (including dividends) and the S&P 500[1]

—— PepsiCo, Inc
—— S&P 500®

[1]The return for PepsiCo and the S&P 500 indices are calculated through March 1, 2013

[2]As of March 1, 2013

| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 (MAR) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 12/00 | 12/01 | 12/02 | 12/03 | 12/04 | 12/05 | 12/06 | 12/07 | 12/08 | 12/09 | 12/10 | 12/11 | 12/12 | 3/13[2] |
| PepsiCo, Inc. | $100 | $99 | $87 | $98 | $111 | $128 | $139 | $172 | $127 | $146 | $161 | $169 | $180 | $201 |
| S&P 500® | $100 | $88 | $69 | $88 | $98 | $103 | $119 | $126 | $79 | $100 | $115 | $118 | $136 | $146 |



# Financial Highlights

**Cumulative Total Shareholder Return**

Return on PepsiCo stock investment (including dividends) and the S&P 500[†]

— PepsiCo, Inc
— S&P 500[*]

[*]The return for PepsiCo and the S&P 500 indices are calculated through March 1, 2013

[†]As of March 1, 2013

| | 12/00 | 12/01 | 12/02 | 12/03 | 12/04 | 12/05 | 12/06 | 12/07 | 12/08 | 12/09 | 12/10 | 12/11 | 12/12 | 3/13[†] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PepsiCo, Inc. | $100 | $99 | $87 | $98 | $111 | $128 | $139 | $172 | $127 | $146 | $161 | $169 | $180 | $201 |
| S&P 500[*] | $100 | $88 | $69 | $88 | $98 | $103 | $119 | $126 | $79 | $100 | $115 | $118 | $136 | $146 |

**Exh.30**

# Financial Highlights

## PepsiCo, Inc and Subsidiaries
(in millions except per share data; all per share amounts assume dilution)

### Summary of Operations

| | 2012 | 2011 | Chg[a] |
|---|---|---|---|
| Core net revenue[b] | $65,492 | $65,881 | -1% |
| Core division operating profit[c] | $10,844 | $11,329 | -4% |
| Core total operating profit[c] | $9,082 | $10,388 | -7% |
| Core net income attributable to PepsiCo[d] | $6,454 | $7,035 | -8% |
| Core net revenue[e] | $4.10 | $4.40 | -7% |

### Other Data

| | | | |
|---|---|---|---|
| Management operating cash flow, excluding certain items[f] | $7,387 | $6,145 | 20% |
| Net cash provided by operating activities | $8,479 | $8,944 | -5% |
| Capital spending | $2,714 | $3,339 | -19% |
| Common share repurchases | $3,219 | $2,489 | 29% |
| Dividends paid | $3,305 | $3,157 | 5% |
| Long-term debt | $23,544 | $20,568 | 14% |

a. Percentage changes are based on unrounded amounts.

b. In 2011, excludes the impact of an extra reporting week. See page 100 "Reconciliation of GAAP and Non-GAAP Information" for a reconciliation to the most directly comparable financial measure in accordance with GAAP.

c. Excludes corporate unallocated expenses, merger and integration charges and restructuring and impairment charges in both years. In 2012, also excludes restructuring and other charges related to the transaction with Tingyi. In 2011, also excludes certain inventory fair value adjustments in connection with our Wimm-Bill-Dann (WBD) and bottling acquisitions and the impact of an extra reporting week. See page 100 "Reconciliation of GAAP and Non-GAAP Information" for a reconciliation to the most directly comparable financial measure in accordance with GAAP.

d. Excludes merger and integration charges, restructuring and impairment charges and the net mark-to-market impact of our commodity hedges in both years. In 2012, also excludes restructuring and other charges related to the transaction with Tingyi and a pension lump sum settlement charge. In 2011, also excludes certain inventory fair value adjustments in connection with our WBD and bottling acquisitions and the impact of an extra reporting week. See page 100 "Reconciliation of GAAP and Non-GAAP Information" for a reconciliation to the most directly comparable financial measure in accordance with GAAP.

e. Excludes merger and integration charges, restructuring and impairment charges and the net mark-to-market impact of our commodity hedges in both years. In 2012, also excludes restructuring and other charges related to the transaction with Tingyi, a pension lump sum settlement charge and tax benefit related to tax court decision. In 2011, also excludes certain inventory fair value adjustments in connection with our WBD and bottling acquisitions and the impact of an extra reporting week. See pages 58 and 100 "Results of Operations - Consolidated Review" in Management's Discussion and Analysis and "Reconciliation of GAAP and Non-GAAP Information" for reconciliations to the most directly comparable financial measures in accordance with GAAP.

f. Includes the impact of net capital spending, and excludes discretionary pension and retiree medical payments, merger and integration payments, restructuring payments and capital expenditures related to the integration of our bottlers in both years. In 2012, also excludes capital expenditures related to the Productivity Plan and payments for restructuring and other charges related to the transaction with Tingyi. See also "Our Liquidity and Capital Resources" in Management's Discussion and Analysis. See page 107 "Reconciliation of GAAP and Non-GAAP Information" for a reconciliation to the most directly comparable financial measure in accordance with GAAP.

http://www.pepsico.com/annual12/#financial-highlights

# Exh.31

**http://atlantablackstar.com/2014/06/22/10-shocking-graphs-prove-black-people-made-little-progress-america/5/**



**Net Wealth by Race**

The above chart, which was created by Matt Bruenig of Demos using 2010 data, breaks down wealth in the U.S. by race. The chart indicates that while white Americans make up only 64 percent of the country's population, they possess more than 88 percent of its wealth.

**Exh.32**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



Figures from the Urban Institute (Chart John Light/Moyers & Company)

**Exh.33**



## MEDIAN HOUSEHOLD INCOME, BY RACE
### 1972-2012

Figures from the US Census Bureau  (Chart  John Light/Movers & Company)

**Exh.34**



INCARCERATION RATES PER 100,000 US RESIDENTS, BY RACE
*1960 and 2010*

Figures from the Pew Research Center. (Chart: John Light/Moyers & Company)

## Median Household Income Gap

For the last few decades, the large disparity between African-Americans' median household income and that of whites has mostly stayed the same. The comparatively low incomes of Black households are made worse by the fact that across all races, most Americans are making less today than they were in 2000.

## Family Wealth Gap

Median household income is one way to measure a given demographic's economic well-being. However, the Urban Institute reports, the racial wealth gap is three times greater than the racial income gap. Wealth is a measure of all the money a family has, including assets — such as a house.

In 1983, for every dollar held by the average Black or Hispanic family, the average white family had five. Instead of shrinking, the gap has increased from the 1980s through today. Now white families lay claim to nearly six times as much as Black families.

**Exh.35**

**Mass Incarceration of Black Males**

Although more Americans of all races are imprisoned today than 50 years ago, the increase has been more dramatic among African-American males.

For every one white man of 100,000 imprisoned in 1960, 2.6 are imprisoned today. For every one Black man out of 100,000 imprisoned in 1960, 3.3 are imprisoned today.

Although in 1960, there were still states maintaining "separate but equal" schools, disenfranchising African-Americans and barring interracial marriage, a larger share of the Black population is behind bars today.

According to the Pew Research Center, for every white man imprisoned in 2010, 6.4 Black men were incarcerated.



Figure 1. Percentage of men aged 20 to 34 in prison or jail, by race/ethnicity and education. 1980 and 2008. Source: Becky Pettit, Bryan Sykes, and Bruce Western. "Technical Report on revised Population Estimates and NLSY79 Analysis Tables for the Pew Public Safety and Mobility Project." (Harvard University, 2009).

**Exh.36**

The rise in incarceration has been especially prominent among young Black males who are also high school dropouts. As shown in the graph above, a staggering 37 percent of those who are both young Black males and high school dropouts are now in prison or jail — a rate that's more than three times higher than what prevailed in 1980.



SHARE OF BLACK CHILDREN IN SEGREGATED SCHOOLS

Figures from Orfield Kucsera and Siegel-Hawley (2012) via the Economic Policy Institute. (Chart: John Light/Movers & Company)

It's been 60 years since the Supreme Court ruled against the concept of "separate but equal" schools in Brown v. Board of Education, however, today, the majority of Black students still attend schools that are majority non-white.

Today, 74. 1 percent of Black students attend majority non-white schools. This is little changed from the numbers in the 1960s (76.6 percent). Almost 40 percent of Black children attend schools that are more than 90 percent non-white.

**Exh.37**



## WHITE-TO-BLACK UNEMPLOYMENT RATIO
*1964-2012*

Figures from the Economic Policy Institute. (Chart: John Light/Moyers & Company)

Housing is another way segregation is implemented in America. Presently, it is not as overt as in the past, but its more subtle and modern forms still have a devastating impact on the wellbeing of the Black community.

One way this occurs – depicted in the chart above – is that Latinos and African-Americans with good credit scores still receive high interest rate mortgages far more often than whites. These mortgages, which are purposed for risky borrowers, are harder to pay off, and are more likely to be foreclosed on.

This phenomenon also helps explain why minorities were hit harder by the Great Recession, and illuminates the modern-day racism that maintains a gaping wealth disparity.

Another inequality that leads to disparity is the unemployment rate differences between Blacks and whites. Research by the Economic Policy Institute, a labor-focused think-tank, found that the unemployment rate among Black Americans has remained at least twice as high as that of white Americans for 50 years.

Back in 1963, the unemployment rate was 5 percent for whites and 10.9 percent for Blacks — or 2.2 times as high for Blacks as for whites. That difference has changed very little up through today. As of 2012, the unemployment rate of Black job seekers was 2.1 times as high as for whites — 14 percent for African-Americans, 6.6 percent for whites.

# Exh.38

# 10 Shocking Graphs That Prove Black People Have Made Little Progress in America

June 22, 2014 | Posted by A Moore

Tagged With: Black unemployment, income disparity in america, income gap in america, racial inequality in america

PERCENTAGE OF AMERICANS IN POVERTY, BY RACE
*1972-2011*



Figures from the US Census Bureau. (Chart credit: John Light/Moyers & Company )

The race-based economic inequities that exist in America place a far greater proportion of Black and Hispanic people below the poverty line than whites. Today, about one in 10 white Americans lives in poverty compared to roughly one in four Hispanic-Americans and African-Americans.

The Great Recession hit Black people particularly hard, with poverty rising from 24.2 percent to 27.5 percent among African-Americans between 2006 and 2011.

**Exh.39**



### PERCENTAGE OF CHILDREN IN POVERTY, BY RACE
*1976-2011*

Figures from the US Census Bureau (Chart  John Light/Moyers & Company)

Racial poverty figures are even more stark in an examination of child poverty. Children of all races are more likely to live in poverty than adults. But for America's racial minorities, the statistics are disturbing.

In 2011, a family of three was living in "poverty" if their income was less than $18,530 a year. About 37.4 percent of Black children and 34.1 percent of Latino children lived in families with incomes below that amount.

That same year, 12.5 percent of white children were considered living in poverty.

**Exh.40**

105

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Dean Panos
Jenner & Block
353 N. Clark St
Chicago IL 60654

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _James o Jermain_  ☐ Agent  ☐ Addressee

B. Received by (Printed Name)  C. Date of Delivery
6-24-14

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

3. Service Type
☐ Certified Mail  ☐ Priority Mail Express™
☐ Registered  ☐ Return Receipt for Merchandise
☐ Insured Mail  ☐ Collect on Delivery

4. Restricted Delivery? (Extra Fee)  ☐ Yes

**Exh.41**

106

From: DPanos@jenner.com
To: ■■■■■■■■■■■■■■■■■■
marc.kesselman@pepsico.com
Subject: RE: Estate of Anna S Harrington
Date: Mon, 31 Mar 2014 23:02:35 +0000
Dear Mr. Hunter,

This e mail follows up on my conversation of this afternoon with Mr. Bob Angel. Mr. Angel has given me his consent to communicate with you this one time, but because you are represented by an attorney, our professional rules of conduct require that all future communications from me or Marc Kesselman will have to be directed only to Mr. Angel as your attorney. Therefore, I hope you will understand that we have to communicate through proper legal protocols and that we are not ignoring your communications when we do not respond directly to you.

We apologize for any delays in responding sooner. PepsiCo and Quaker are actively searching for contracts that would pertain to Ms. Anna S. Harrington, which if they exist go back 60 years or even longer. We thus far have not located these documents in the places that have been searched. As I discussed with Mr. Angel, the issue for us is trying to determine all the places that we would need to search to attempt to locate these documents if they exist. As I am sure you know, the company has evolved and grown significantly over the decades with many changes in the physical locations of where very old documents might be stored. We anticipate that it may take us 3 weeks or more to complete this search and therefore I suggest that I contact Mr. Angel 3 weeks from today to let him know the status of our search efforts. I will report back to Mr. Angel sooner if I am able to based on our investigation.

Please have Mr. Angel let me know if this is acceptable to you.

Regards,

Dean

**Exh.42**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exh.43

1

2　Larnell Evans Sr.
　2614 N. Market Street
3　Apt #1
　Jacksonville FL 32206
4

5　*In Propria Persona*

　　　　UNITED STATES DISTRICT COURT
6　　　　NORTH DISTRICT OF ILLINOIS

7
　D.W.HUNTER., an　　　　　│　Case
8　Individual, LARNELL EVANS │　No._____
　JR., an Individual FOR　 │
9　THE ESTATE OF ANNA SHORT　│
　HARRINGTON, an Individual │　　**AFFIDAVIT OF**
10　("AUNT JEMIMA")　　　　　│　**LARNELL EVANS SR.**
11　　　PLAINTIFFS'　　　　 │

12　　　　　vs.　　　　　　│
13　PEPSICO Inc., a　　　　　│
　Corporations,　THE QUAKER │
14　OATS COMPANY, a　　　　　│
15　Corporation,　PINNACLE　 │
　FOODS GROUP, LLC, THE　　 │
16　HILLSHIRE BRANDS COMPANY, │
17　a Corporation, and DOES 1 │
　through 25, inclusive,　　│
18　　　DEFENDANTS.　　　　 │

19

20　IN AND FOR THE COUNTY )

　OF DUAL IN THE DUVAL　)ss.
21

　STATE OF FLORIDA　　　 )
22

　　　I, <u>Larnell Evans. Sr.,</u> hereby depose and say's:
23

24　　　1.　I am the Great Grandson born in the house of Anna

25　Short Harrington, a.k.a. (Aunt Jemima 1935-1955) that is

26　listed on the death certificate. (Exhs. 1,2,3,4,5,6,7, 8, 9

　　　　　　　　　　　　　　　　　　　Exh. 4/3

2.   When I was a little boy, the first time I learned about horses was when the Buffalo Soldiers Calvary road on horseback from down South into Syracuse; in order, to savor the taste of the best pancakes in the world prepared by my Great Grandmother Anna S. Harrington, a.k.a. Aunt Jemima.

3.   After my Great Grandmother passed away, then the torch was passed to Aunt Deloris Hoffman who also was portrayed as Aunt Jemima in the Syracuse region. My Aunt Deloris passed away at the early age of 40. (Exhs. 10, 11, 12,13,14,15,16,17,18,19,20,21,22,23,24,25,26,27,28,29,30,31 42)

4.   Prior to PepsiCo and Quaker Oats Executives changing the image on the latest box, Executives contacted my Grandmother Olivia Hunter, and entered into discussions with Aunt Liz, and my mother Wizzie; where thereafter, the Defendants sent a photo opt team to my Grandmother Olivia's house to snap a picture of her likeness.

5.   I informed my cousin D. W. Hunter in March that Quaker Oats and/or PepsiCo Executives acquired a picture of our Grandmother Olivia Hunter. Thereafter, my cousin D.W. Hunter began to investigate Quaker Oats and PepsiCo at the USPTO.



Reg. No. 1697862

Grandma Olivia Hunter

Exl. 43

2

I declare under the "**penalty of perjury**" in the State of Minnesota that all of the above herein are true and correct to the best of my knowledge and belief and if called to testify to the same, I could and would testify accordingly.

DATED this _8th_ day of July 2014

Submitted,

Larnell Evans Sr.

STATE OF Florida )

):ss

COUNTY OF Duval )

On the _8th_ day of Affidavit, July 2014, personally appeared before me Larnell Evans Sr., the signer of the foregoing Affidavit, who duly acknowledged that he executed the same.

Deborah Barbare


Notary Public State of Florida
Deborah C Barbare
My Commission EE116997
Expires 09/21/2015

Notary Public

My Commission Expires: _9-21-15_

Exh. 43

3

1          **CERTIFICATE OF SERVICE**

2   FOR THE COUNTY OF     ]
    RAMSEY IN THE         ] ss.          Case No.: _____
3   STATE OF MINNESOTA    ]

    I, **D.W. Hunter** , HEREBY certify that I am over the age of 18 years
4   old, and located at 1275 Lincoln Ave. Ste#1, St. Paul, MN 55105.  I
    certify that I have placed a prepaid postage, true and complete
5   original to the court and copies to the party(is) of record at the
    U.S. Postal Office located at Post Office **St. Paul MN.** on the date of
6   July 3, _2014_, for this action of the following:

7          **AFFIDAVIT OF LARNELL EVANS SR + Exhs. 1 thru 42)**

| | |
|---|---|
| **c/o PepsiCo, Inc.**<br>700 Anderson Hill Road Purchase,<br>N.Y. NY 10577 ;<br>555 West Monroe Street,<br>Chicago, IL 60661,<br>(Ph): (914) 253-2000,<br>Fax Number: (914) 253-2070.<br>**c/o CT Corporation System,**<br>111 Eighth Ave.<br>N.Y., N.Y. 10011 | c/o Agent: C T Corporation System<br>Pinnacle Foods Group, LLC,<br>208 SO. LaSalle St,<br>Ste # 814<br>Chicago, IL 60604,<br>and a Principal place of business 99<br>Jefferson Road, Parsippany, NJ 07054. |
| The Quaker Oats Company<br>555 W Monroe St. Fl. #1<br>Chicago, Illinois 60661-3716<br>**c/o CT Corporation System**<br>208 So. LaSalle St.<br>Suite 814<br>Chicago, IL 60604 | c/o Clerk<br>United States District Court<br>Northern District of Illinois<br>Everett McKinley Dirksen<br>United States Courthouse<br>219 South Dearborn Street<br>Chicago, IL 60604 |
| **c/o Agent: C T Corporation System**<br>The Hillshire Brands Company,<br>208 So. LaSalle St, Ste# 814<br>Chicago, IL 60604,<br>**c/o Secretary: Kent B. Magill**<br>400 S Jefferson St.<br>Chicago, IL 60607. | |

            I declare under the penalty of perjury under the laws of
    the State of Minnesota that the above is true and correct.

    Date: **08/ / /14**

                                    Respectfully Submitted,

                                    D. W. Hunter

                                        E x h. 43

| STATUS | DOCUMENTS | ❓ | | ⬇ Download ▲ | 🖨 Print Preview |
|---|---|---|---|---|---|

**Generated on:** This page was generated by TSDR on 2014-08-12 23:12:27 EDT

**Mark:** AUNT JEMIMA

**US Serial Number:** 74180630      **Application Filing Date:** Jun. 28, 1991

**US Registration Number:** 1697862      **Registration Date:** Jun. 30, 1992

**Register:** Principal

**Mark Type:** Trademark

**Status:** The registration has been renewed.

**Status Date:** Jun. 29, 2012

**Publication Date:** Apr. 07, 1992

**▼ Mark Information**      ▼ Expand All

**Mark Literal Elements:** AUNT JEMIMA

**Standard Character Claim:** No

**Mark Drawing Type:** 3 - AN ILLUSTRATION DRAWING WHICH INCLUDES WORD(S)/ LETTER(S)/NUMBER(S)

**Color(s) Claimed:** Color is not claimed as a feature of the mark.

**Lining and Stippling Statement:** The stippling on the drawing is used to indicate shading.

**Design Search Code(s):** 02.03.01 - Busts of women facing forward; Portraiture of women facing forward; Women - head, portraiture or busts facing forward; Heads of women facing forward
26.01.02 - Plain single line circles; Circles, plain single line

**Name Portrait Consent:** "AUNT JEMIMA" is a fanciful name and does not refer to any known living individual. The portrait also does not depict a living individual.

**▸ Related Properties Information**

**Exh.44**

# Janet Silverberg

Chief Trademark Counsel at PepsiCo Chicago

Greater Chicago Area | Law Practice

Previous    The Quaker Oats Company, Sidley & Austin
Education   Harvard Law School

3rd

**Connect**    Send Janet InMail    ▾

**319**
connections

"In annual registration, attorney reported that he/she does not have malpractice coverage. (Some attorneys, such as judges, government lawyers, and in-house corporate lawyers, may not carry coverage due to the nature of their practice setting.)"

▾ **Current Owner(s) Information**

Owner Name:  Quaker Oats Company, The

Owner Address:  555 West Monroe Street
Chicago, ILLINOIS 60661
UNITED STATES

Legal Entity Type:  CORPORATION

State or Country Where Organized:  NEW JERSEY

▾ **Attorney/Correspondence Information**

**Attorney of Record**

Attorney Name:  JANET L SILVERBERG

Attorney Primary Email Address:  trademarks@pepsico.com

Attorney Email Authorized:  Yes

**Correspondent**

Correspondent Name/Address:  JANET L SILVERBERG
PepsiCo, Inc.
7701 Legacy Drive
Mail Stop 3A-421
Plano, TEXAS 75024
UNITED STATES

Phone:  972-334-2587

Fax:  972-334-3871

Correspondent e-mail:  trademarks@pepsico.com

Correspondent e-mail Authorized:  Yes

**Domestic Representative - Not Found**

▴ Prosecution History

▴ Maintenance Filings or Post Registration Information

▾ TM Staff and Location Information

**TM Staff Information - None**

**File Location**

# Exh.45

110

## "Named Mysteriously whipped from Data Base"
## 08/14/14

**ARDC** ATTORNEY REGISTRATION & DISCIPLINARY COMMISSION
OF THE SUPREME COURT OF ILLINOIS

WEBSITE INFORMATION | SEARCH SITE | HOME

Lawyer Search

Lawyer Registration

How to Submit a Request
For Investigation

Rules and Decisions

Ethics Inquiry Program

Publications

New Filings, Hearing
Schedules and Clerk's Office

Client Protection Program

Resources & Links

ARDC Organizational
Information

### *LAWYER SEARCH RESULTS*

Edit Search    New Search

ARDC Lawyer Search Results from the ARDC database last updated as of August 14, 2014 at 1:26 01 PM for the following terms: Last Name: silverberg, First Name: Janet   status: All

Your search terms do not match the record of any lawyer licensed in Illinois. Please check your terms for accuracy and try your search again

NOTE ON NAMES: The last name is a required field, but you may choose a phonetic search, particularly if you are not sure of the spelling of the last name

NOTE ON ADDRESSES:

Addresses for certain attorneys are not presented on our website due to privacy considerations or because we do not have the data. These attorneys may include retired judges, retired lawyers, inactive lawyers, deceased lawyers and lawyers who have never registered with the ARDC

If you believe an attorney may have one of the above statuses, please DO NOT fill in any of the ADDRESS FIELDS when attempting your search. Entering any address information for such attorneys will automatically exclude them from your search

Additionally, if you are not certain that you have the correct address information for an attorney, please do not fill in the address fields. An erroneous value will exclude that attorney from your search

If you have any questions or issues about using this page, please email registration@iardc.org.

Edit Search    New Search

# Exh.46

# ECONOMIC ESPIONAGE

Date: Thu, 6 Mar 2014 12:41:47 -0800

Subject: Fwd: ████████████

From: rm█████

To: d████hunter@██████; d████hunter@████████

---------- Forwarded message ----------
From: <Vital_Statistic_Orders%ONGOV@ongov.net>
Date: Thu, Mar 6, 2014 at 12:39 PM
Subject: Re: D████ Hunter
To: R█████████ <rm█████████>

Per our phone conversation I have a couple of suggestions for Mr Hunter
1) áPurchase a genealogy copy. áIt has all of the same information on it as
a certified copy.
2) Have his litigation attorney send a request on his letterhead. áIn the
body of the letter he/she should give the decedents name and date of death
and state that the document is needed for a legal procedure and who they
are representing (also if they could include why the certificate is
required for the procedure it would be helpful because the attorney is
supposed to be representing a legally entitled party which Mr Hunter is
not). áThe letter must be signed by the attorney and a copy of their bar
association/court ID enclosed along with a copy of their driver's license
and company check for $30.
3) As we are governed by New York State Public Health Laws and New York
State Policy and Procedures, Mr Hunter may want to try contacting New York
State Vital Records at 1-855-322-1022. áTheir mailing address is Department
of Health, Vital Records Section, P.O. Box 2602, Albany, NY 12220-2602.

If you have any questions, please feel free to contact me. áThank you for
your help.

**Exh.47**

112

AUG 11 2014 5:10PM ET

# 'Aunt Jemima' Heirs Demand $2 Billion Payday From Pepsi and Quaker Oats

RUSSELL BERMAN



**Exh.48**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exh.49





1955368

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

**August 19, 2014**

**THIS IS TO CERTIFY THAT ANNEXED IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF THE APPLICATION AS FILED FOR:**

**TRADEMARK APPLICATION:** *71/385,940*
**FILING DATE:** *November 24, 1936*

By Authority of the
**Under Secretary of Commerce for Intellectual Property**
**and Director of the United States Patent and Trademark Office**



**P. R. GRANT**
**Certifying Officer**

NOV-24-36   097994   F.w Chk.    15.00

385940

481

AUNT JEMIMA & Design

To the Commissioner of Patents:

THE QUAKER OATS COMPANY, a corporation duly organized under the laws of the State of New Jersey, located and doing business at 141 West Jackson Boulevard, Chicago, Illinois, has adopted and used the trade-mark shown in the accompanying drawing, the lining indicating shading only, for grits, white and yellow cornmeal, ready-mix buckwheat, corn and wheat flour, and ready-mix pancake flour, in Class 46, foods, and ingredients of foods, and presents herewith five specimens showing the trade-mark as actually used by applicant upon the goods, and requests that the same be registered in the United States Patent Office in accordance with the Act of February 20, 1905, as amended. The picture forming a part of the mark is not the portrait of any individual.

The words " AUNT JEMIMA " have been continuously used by the applicant and its predecessors in business since November 27, 1889, and the picture of a negress has been used by the applicant and its predecessors in business since July 11, 1917.

The trade-mark is applied or affixed to the goods by printing, stenciling, or otherwise impressing the same upon bags, barrels, cartons, or other receptacles containing the goods, and in divers other ways.

Applicant is the owner of the following registrations and of the marks shown therein:

| | | |
|---|---|---|
| No. 17,825 | April 29, 1890 | (renewed), |
| No. 40,006 | March 31, 1903 | (renewed), |
| No. 51,056 | April 3, 1906 | (renewed), |
| No. 90,516 | March 4, 1913 | (renewed), |
| No. 116,271 | April 24, 1917, | |
| No. 118,737 | October 2, 1917, | |
| No. 120,159 | January 15, 1918, | |
| No. 120,160 | January 15, 1918, | |
| No. 123,884 | December 17, 1918, | |
| No. 146,681 | September 20, 1921, and | |
| No. 166,082 | March 27, 1923. | |

- 1 -

482

The undersigned hereby appoints Edward S. Rogers, William T. Woodson, and James H. Rogers, 801 Peoples Gas Building, Chicago, Illinois, and Francis L. Browne, Dudley Browne, and Thomas L. Mead, Jr., 850 Munsey Building, Washington, D. C., its attorneys to prosecute this application for registration, with full powers of substitution and revocation, to make alterations and amendments therein, to receive the certificate, and to tranact all business in the Patent Office connected therewith.

THE QUAKER OATS COMPANY,

By _John D Stuart_ = President.

(John Stuart)

- 2 -

483

## DECLARATION.

State of  Illinois        )
                          ) ss
County of  Cook           )


- - - - - - - - John Stuart - - - - - -, being duly sworn,
deposes and says, that he is- - - - - President - - - of the
corporation, the applicant named in the foregoing statement;
that he believes the foregoing statement is true; that he
believes said corporation to be the owner of the trade mark
sought to be registered; that no other person, firm, cor-
poration or association, to the best of his knowledge and
belief, has the right to use said trade mark, either in the
identical form or in any such near resemblance thereto as
might be calculated to deceive; that said trade mark is used
by said corporation in commerce among the several states
of the United States; that the drawing presented truly repre-
sents the trade mark sought to be registered, and that the
specimens show the trade mark as actually used upon the goods.

_John Stuart_

Subscribed and sworn to before me
this - - 19th  day of November, 1936.

_D. F. Kelso_
Notary Public.

- 3 -






MAIL DIVISION

NOV 24 1936

U.S. PATENT OFFICE

1 LB. 8 OZ. NET

# AUNT JEMIMA
# GRITS
## A CORN DELICACY
### DEGERMED



REG. U. S. PAT. OFF.

Made by
**The Quaker Oats Company**
ADDRESS: CHICAGO, U.S.A.

---

### AUNT JEMIMA GRITS

*You will also like*

**AUNT JEMIMA
READY-MIX
for PANCAKES**

Today you can make the same light, fluffy, soul-satisfying pancakes that were the talk of the countryside—with Aunt Jemima recipe all ready to mix with milk or water. Not a single thing to prepare. It's easy to get perfect pancakes every time, following the simple directions and give the family a real adventure at mealtime.

**AUNT JEMIMA
READY-MIX
for
BUCKWHEATS**

Buckwheat cakes with that old time tang—you can make them right in your own home. With Aunt Jemima ready-mix for Buckwheats, all ready to mix with milk or water. Nothing to prepare. Perfect results every time. Treat the family to a meal of delicious Aunt Jemima Buckwheats frequently.

---

### AUNT JEMIMA GRITS

#### A CORN DELICACY

Served as breakfast cereal or vegetable. Cooks quickly. Appetizing and nourishing.

Aunt Jemima Hominy Grits is a food your family will heartily enjoy. It's just the sweetest, most nourishing part of choice white corn. All the rest is carefully milled away. You will find it delightful in flavor, easy to digest—a real corn delicacy.

**Directions:** Add one cup Aunt Jemima Hominy Grits to three and one-half cups of boiling water, slightly salted, and boil forty minutes in a double boiler. If open boiler is used, add four cups of boiling water. Keep boiling slowly for twenty minutes.

As a breakfast food or cereal, serve with cream and sugar.

As a vegetable, serve with butter or gravy. Served in this way it makes a delightful dinner dish.

Slices of cold boiled Grits, dipped in egg and fried to a golden brown, are very appetizing—a breakfast or supper treat.

*This package carries our unqualified guarantee and your grocer is authorized to refund your money if you are not entirely pleased.*

Made by
**The Quaker Oats Company**
ADDRESS: CHICAGO, U.S.A.

---

### AUNT JEMIMA GRITS

*You will also like*

**AUNT JEMIMA
YELLOW CREAM
CORN MEAL**

A degermed yellow corn meal. Makes delicious corn meal mush, corn bread, corn dodgers, spoon corn bread. Carries unqualified guarantee of The Quaker Oats Company, which means your money will be refunded, if, for any reason, you are not entirely pleased.

**AUNT JEMIMA
WHITE CREAM
CORN MEAL**

A degermed white corn meal of finest quality. If you prefer a white corn meal, use Aunt Jemima White Cream Corn Meal for corn meal mush, corn bread, etc.

1 LB. 8 OZ. NET

# AUNT JEMIMA
## YELLOW CREAM
# CORN MEAL
### DEGERMED

REG. U. S. PAT. OFF.



Made by
The Quaker Oats Company
ADDRESS: CHICAGO, U.S.A.

*You will also like*

## AUNT JEMIMA
### YELLOW CREAM
### CORN MEAL

### AUNT JEMIMA
### READY-MIX
### for PANCAKES

Today you can make the same light, fluffy, satisfying pancakes that were the talk of the countryside—with Aunt Jemima recipe, all ready to mix with milk or water. Not a single thing to prepare. It's easy to get perfect pancakes every time. Follow the simple directions and give the family a real adventure at mealtime.

### AUNT JEMIMA
### READY-MIX
### for
### BUCKWHEATS

Buckwheat cakes with that old time tang—you can make them right in your own home. With Aunt Jemima ready-mix for Buckwheats, all ready to mix with milk or water. Nothing to prepare. Perfect results every time. Treat the family to a meal of delicious Aunt Jemima Buckwheats frequently.

Made by
The Quaker Oats Company
ADDRESS: CHICAGO, U.S.A.

## AUNT JEMIMA
### YELLOW CREAM CORN MEAL

#### CORN MEAL MUSH
Add one cup Aunt Jemima Cream Meal to 3⅔ cups of boiling water, slightly salted, and cook in double boiler thirty minutes.

#### CORN BREAD

1⅓ cups Aunt Jemima Corn Meal
¾ cup flour
¾ teaspoon baking powder
¼ cup sugar

1 teaspoon salt
About 1 cup milk
1 tablespoon fat
1 egg

Mix Corn Meal, flour, baking powder, sugar and salt. Add milk, beaten egg and melted fat. Bake in a hot oven.

CORN MEAL MUSH. Slowly pour one cup of Aunt Jemima Corn Meal into 4 cups rapidly boiling salted water, stirring constantly. Cook thirty minutes or longer and serve with sugar and cream. A delightful touch is added by stirring in ½ cup raisins before cooking.

AS A VEGETABLE, serve mush (recipe above) with gravy or butter for luncheon and dinner.

FRIED MUSH. Chill mush (recipe above), slice and fry in hot fat. Serve with syrup, butter and sugar or crushed fruit.

#### CORN DODGERS
Pour three-fourths of a pint of boiling water over one pint of Aunt Jemima Corn Meal, a teaspoon of salt, two tablespoons of lard, stir well, and when cool add one-half cup of milk. Shape in small oblong pones, put on a greased hot skillet and bake in the oven until brown. The success of making corn dodgers depends largely upon the baking. The skillet should be very hot and well greased, and the dodgers should be cooked in a hot oven.

#### SPOON CORN BREAD
Scald two cups of Aunt Jemima Corn Meal and one teaspoon of salt with one and one-half cups boiling water. Beat two eggs together and add two cups of buttermilk and one level teaspoon of soda. Combine the mixtures, cook in a baking pan forty or fifty minutes. This is served with a spoon from the dish in which it is cooked.

*This package carries our unqualified guarantee and your grocer will refund your money if you are not entirely pleased.*

## AUNT JEMIMA
### YELLOW CREAM
### CORN MEAL

*You will also like*

### AUNT JEMIMA
### WHITE CREAM
### CORN MEAL

A degermed white corn meal. Makes delicious corn meal mush, corn bread, corn dodgers, spoon corn bread. Carries unqualified guarantee of The Quaker Oats Company, which means your money will be refunded, if, for any reason, you are not entirely pleased.

### AUNT JEMIMA
### GRITS

A corn delicacy made from sweetest part of choice white corn. May be served either as a breakfast cereal, with cream and sugar, or as a vegetable, with butter or gravy. Delightfully appetizing and wonderfully nourishing. Cooks quickly. Fully guaranteed by The Quaker Oats Company.



U.S PATENT OFFICE.

NOV 24 1976

JAN DIVISION.

# AUNT JEMIMA
## WHITE CREAM
# CORN MEAL

DEGERMED



REG. U. S. PAT. OFF.

Made by
The Quaker Oats Company
ADDRESS: CHICAGO, U.S.A.

---

### AUNT JEMIMA
#### WHITE CREAM
#### CORN MEAL

*You will also like*

### AUNT JEMIMA
*READY-MIX*
*for* PANCAKES

Today you can make the same light, fluffy, mouth-satisfying pancakes that were the talk of the countryside—with Aunt Jemima recipe, all ready to mix with milk or water. Not a single thing to prepare. It's easy to get perfect pancakes every time. Follow the simple directions and give the family a real adventure at mealtimes.

### AUNT JEMIMA
*READY-MIX*
#### BUCKWHEATS

Buckwheat cakes with that old time tang—you can make them right in your own home. With Aunt Jemima ready-mix for buckwheats, all ready to mix with milk or water. Nothing to prepare. Perfect results every time. Treat the family to a meal of delicious Aunt Jemima Buckwheats frequently.

---

### AUNT JEMIMA
#### WHITE CREAM CORN MEAL

#### CORN MEAL MUSH

Add one cup Aunt Jemima Cream Meal to 3½ cups of boiling water, slightly salted, and cook in double boiler thirty minutes.

#### CORN BREAD

| | |
|---|---|
| 1½ cups Aunt Jemima | 1 teaspoon salt |
| Corn Meal | About 1 cup milk |
| ½ cup flour | 1 egg |
| 4 teaspoons baking powder | 1 tablespoon fat |
| ¼ cup sugar | |

Mix Corn Meal, flour, baking powder, sugar and salt. Add milk, beaten egg, and melted fat. Bake in a hot oven.

CORN MEAL MUSH. Slowly pour one cup of Aunt Jemima Corn Meal into 4 cups rapidly boiling, salted water, stirring constantly. Cook thirty minutes or longer and serve with sugar and cream. A delightful touch is added by stirring in ½ cup raisins before cooking.

AS A VEGETABLE, serve mush (recipe above) with gravy or butter for luncheon and dinner.

FRIED MUSH. Chill mush (recipe above), slice and fry in hot fat. Serve with syrup, butter and sugar or crushed fruit.

#### CORN DODGERS

Pour three-fourths of a pint of boiling water over one pint of Aunt Jemima Corn Meal, a teaspoon of salt, two table-spoons of lard, stir well, and when cool add one-half cup of milk. Shape in small oblong pones, put on a greased hot skillet and bake in the oven until brown. The success of making corn dodgers depends largely upon the baking. The skillet should be very hot and well greased, and the dodgers should be cooked in a hot oven.

#### SPOON CORN BREAD

Scald two cups of Aunt Jemima Corn Meal and one tea-spoon of salt with one cup of boiling water. Beat two eggs together and add two cups of buttermilk and one level teaspoon of soda. Combine the mixtures, cook in a baking pan forty or fifty minutes. This is served with a spoon from the dish in which it is cooked.

*This package carries our unqualified guarantee and your grocer will refund your money if you are not entirely pleased.*

Made by
The Quaker Oats Company
ADDRESS: CHICAGO, U.S.A.

---

### AUNT JEMIMA
#### WHITE CREAM
#### CORN MEAL

*You will also like*

### AUNT JEMIMA
#### YELLOW CREAM
#### CORN MEAL

A degermed yellow corn meal. Makes delicious corn meal mush, corn bread, corn dodgers, spoon corn bread. Carries unqualified guarantee of The Quaker Oats Company, which means your money will be refunded, if, for any reason, you are not entirely pleased.

### AUNT JEMIMA
#### GRITS

A corn delicacy made from sweetest part of choice white corn. May be served either as a breakfast cereal, with cream and sugar, or as a vegetable, with butter or gravy. Delightfully appetizing and wonderfully nourishing. Cooks quickly. Fully guaranteed by The Quaker Oats Company.



Insist on Aunt Jemima to guarantee tenderness.

1 LB. 4 OZ. NET

# AUNT JEMIMA
## READY-MIX
### for PANCAKES

REG. U.S. PAT. OFF.

MIXTURE OF WHEAT, CORN, RYE AND RICE FLOUR, PHOSPHATE, CORN SUGAR, SODA, SALT AND POWDERED SKIM MILK.

## AUNT JEMIMA'S MAGIC MENUS

**OLD SOUTHERN PANCAKE BREAKFAST**
Stewed Fruit
AUNT JEMIMA
PANCAKES
Butter · Syrup
Bacon
Coffee

**HOT CAKES AND PORK SAUSAGE—COUNTRY STYLE**
Tomato Juice
AUNT JEMIMA
PANCAKES
Syrup · Butter · Coffee
Pork Sausages
For Supper
add Fruit, Cheese,
or Ice Cream Dessert.

**PANCAKE BREAKFAST PLANTATION STYLE**
Orange Juice
Grapefruit Juice
AUNT JEMIMA
PANCAKES
Butter · Syrup
Little Pig Sausages
Coffee

**WAFFLES AND FRIZZLED HAM**
Chilled Orange Juice
AUNT JEMIMA
WAFFLES
Syrup or Butter · Frizzled
Honey Ham
Coffee

When served with fried chicken or ham and covered with a preserve and syrup, Aunt Jemima Waffles are a treat for the whole family.

## Make Mealtime an Adventure

Today you can make the same light, fluffy, soul-satisfying pancakes that were the pride of the countryside—with Aunt Jemima recipe, all ready to mix with milk or water. Not a single thing to prepare. It's easy to get perfect pancakes, light and well done. Just follow the simple directions below and give the family a real adventure at mealtime.

## How to make wonderful PANCAKES



1. Mix milk or water with an equal amount of Aunt Jemima Ready-Mix for Pancakes. In a twinkling the batter is ready.

2. Have griddle or skillet just hot enough. To test, put a drop of water on griddle. If it goes right off, it's not quite hot; griddle is too hot. If it bounces around a second before evaporating, griddle is hot enough.

3. Grease griddle very lightly. Don't pour grease on griddle. Spread it thinly with pad.

4. Pour batter onto griddle. Let each side bake until a golden brown. Never pat cakes.

Made by
**The Quaker Oats Company**
ADDRESS—CHICAGO, U.S.A.
St. Joseph, Missouri—Akron, Ohio—Cedar Rapids, Iowa

IF YOU DO NOT AGREE THAT THIS IS THE LIGHTEST AND MOST CONVENIENT PANCAKE FLOUR YOU HAVE EVER USED, WE SHALL GLADLY REMIT YOU THE COST OF THE PACKAGE

## AUNT JEMIMA WAFFLES

1. Measure 2 cups Aunt Jemima Ready-Mix for Pancakes into mixing bowl. In another bowl beat 1 egg and combine with 2 cups milk or water. Pour liquid and 2 tablespoons melted butter or shortening into flour a little at a time, stirring until smooth. That makes six waffles.

2. Have waffle iron hot enough to bake a waffle perfectly in three minutes.

3. Grease iron lightly. An electric iron requires no greasing after paraffin has been brushed lightly on it before its original use.

4. Serve waffles as soon as done. Never stack. Stacking spoils crispness.

FOR A CHANGE—treat the family to the delicious flavor of

# AUNT JEMIMA
## READY-MIX
### FOR BUCKWHEATS



MAIL DIVISION

NOV 24 1936

U.S. PATENT OFFICE

# AUNT JEMIMA

344873



REGISTERED

APR 6 1937



Published in O. G.

JAN 26 1937

U. S. Patent Office.

*Proprietor:*
The Quaker Oats Company
By Edward S. Rogers
William T. Woodson
James H. Rogers
*Attorneys*

The Craftsman Calg Co

NOV 24 36

PATENT OFFICE

PHOTOGRAPHS

DEC 2 - 1936

NOV 24 1935

U.S. PATENT OFFICE

Page 1 of 1

| ORDER NUMBER | | | | 1955368 | | |
|---|---|---|---|---|---|---|
| REFERENCE ORDER NUMBER | | | | | 0 | |
| BIN NUMBER | | | | | 0 | |

DELIVERY INSTRUCTIONS

| ORDER DATE/TIME | PALM NUMBER | CUSTOMER NUMBER | CONTACT PHONE NUMBER | PAYMENT METHOD | TOTAL COST OF ORDER |
|---|---|---|---|---|---|
| 2014/08/05 03:47:00 | | IDON959845 | | CREDIT CARD | $ 15.00 |

BROADCAST MESSAGE

ORDER INFORMATION

| ORDER LINE | PRODUCT TYPE | DOCUMENT IDENTIFIER | COPIES | STATUS | CUSTOMER REFERENCE |
|---|---|---|---|---|---|
| 1 | BB1 | 71385940 | 1 | FILLED | |

E-MAIL

FAX NUMBER

CARRIER
UPS

CARRIER TRACKING NUMBER
1Z4XA59824475O2291

CARRIER ACCOUNT NUMBER

OUR ACCOUNT

FROM : Mail Stop Document Services
Director of the U.S. Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

TO: DANNEZ WESTBROOK HUNTER
1275 LINCOLN
SUITE 1
ST. PAUL, MN 55105
USA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exh.50



1955365

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

**August 13, 2014**

THIS IS TO CERTIFY THAT ANNEXED IS A TRUE COPY FROM THE
RECORDS OF THIS OFFICE OF THE APPLICATION AS FILED FOR:

**TRADEMARK APPLICATION:** *74/180,630*
**FILING DATE:** *June 28, 1991*
**REGISTRATION NUMBER:** *1,697,862*
**REGISTRATION DATE:** *June 30, 1992*

By Authority of the
**Under Secretary of Commerce for Intellectual Property**
**and Director of the United States Patent and Trademark Office**

**T. LAWRENCE**
**Certifying Officer**

**74/180630**

TRADEMARK APPLICATION SERIAL NO._____

U.S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE
FEE RECORD SHEET

LU1S176  07/12/91  74180630        17-0020  150   301      175.00CH



*C A*

( The Quaker Oats Company
Law Department
P.O. Box 9001
Chicago, Illinois 60604-9001)

⁴ · 180630

Area Code 312
Telephone 222-7111

June 25, 1991

Commissioner of Patents
and Trademarks
Washington, D.C.  20231

Re:  Trademark Application for
AUNT JEMIMA and Design
International Class 30

Dear Sir:

Enclosed is an Application for the above-identified
trademark including three (3) specimens per class in support
thereof.  Please charge $175.00 against our deposit account
#17-0020 to cover the applicable fee.  A duplicate copy of
this letter is enclosed.

Very truly yours,

Janet Silverberg

AT    (Janet L. Silverberg)
Attorney for Applicant
The Quaker Oats Company

JLS/sh

Enclosure

Quaker Tower, 25th Floor, 321 North Clark Street, Chicago, Illinois 60610

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE 180630

MARK: AUNT JEMIMA and
Design

INTL. CL.: 30

TO THE COMMISSIONER OF PATENTS AND TRADEMARKS:

The Quaker Oats Company, a corporation formed under the laws of the State of New Jersey and having its principal place of business at Quaker Tower, 321 North Clark Street, Chicago, Illinois 60610, has adopted and is using the trademark shown on the accompanying drawing on or in connection with PANCAKE AND WAFFLE MIX; GRITS; WHEAT FLOUR; PREPARED BAKING MIXES AND BATTER FOR MAKING CAKES, BREADS AND MUFFINS; FROZEN PANCAKE BATTER; TABLE SYRUP; CORN MEAL; FROZEN BREAKFAST FOODS, NAMELY WAFFLES, PANCAKES, AND FRENCH TOAST; AND BAKERY GOODS in International Class 30 and requests that said mark be registered in the United States Patent and Trademark Office on the Principal Register established by the Act of July 5, 1946 (15 U.S.C. 1051 et seq., as amended).

The trademark was first used in connection with the goods at least as early as October 1, 1989; in interstate commerce at least as early as October 1, 1989; and is now in use in such commerce.

The mark is used by applying it to the containers for the goods and three (3) specimens showing the mark as actually used are presented herewith.

Applicant is in compliance with the provisions of the Federal Food, Drug and Cosmetic Act requiring that the labeling of all packaged goods moving in commerce bear the name and address of the manufacturer, distributor or packer of the goods, the common or usual name of the goods, a statement of the ingredients, and the net quantity of the contents as of the date of first use in commerce as set forth in this application.

Applicant would like to point out that it is the owner of the following United States trademark registrations as shown by the records of the Patent and Trademark Office:

AUNT JEMIMA TOASTER BROWNS                REG. NO.: 1,549,337
                                          GRANTED: 7/25/89

AUNT JEMIMA HOMESTYLE                      REG. NO.: 1,534,523
BREAKFAST                                  GRANTED: 4/11/89

-2-

| | |
|---|---|
| AUNT JEMIMA HOMESTYLE BREAKFAST | REG. NO.: (1,590,083) GRANTED: 4/3/90 |
| AUNT JEMIMA | REG. NO.: ( 522,386) GRANTED: 3/14/50 |
| AUNT JEMIMA PANCAKE EXPRESS | REG. NO.: (1,590,100) GRANTED: 4/3/90 |
| AUNT JEMIMA | REG. NO.: (797,560) GRANTED: 10/12/65 |
| AUNT JEMIMA | REG. NO.: (1,575,365) GRANTED: 1/2/90 |
| AUNT JEMIMA | REG. NO.: (1,590,084) GRANTED: 4/3/90 |
| AUNT JEMIMA & PICTURE | REG. NO.: (120,160) GRANTED: 1/15/18 |
| AUNT JEMIMA & PICTURE | REG. NO.: ( 123,884) GRANTED: 12/17/18 |
| AUNT JEMIMA & PICTURE | REG. NO.: (146,681) GRANTED: 9/20/21 |
| AUNT JEMIMA & PICTURE | REG. NO.: (523,167) GRANTED: 3/28/50 |
| AUNT JEMIMA & PICTURE | REG. NO.: ( 344,873) GRANTED: 4/6/37 |
| AUNT JEMIMA & PICTURE | REG. NO.: ( 866,534) GRANTED: 3/11/69 |
| AUNT JEMIMA HOMESTYLE | REG. NO.: (897,031) GRANTED: 8/18/70 |
| AUNT JEMIMA LITE | REG. NO.: (1,247,235) GRANTED: 8/2/83 |
| AUNT JEMIMA TOASTER KITCHEN | REG. NO.: (797,561) GRANTED: 10/12/65 |
| AUNT JEMIMA'S PICTURE | REG. NO.: ( 51,056) GRANTED: 4/3/06 |
| AUNT JEMIMA'S PANCAKE FLOUR & PICTURE | REG. NO.: ( 17,825) GRANTED: 4/29/1890 |
| MISCELLANEOUS DESIGN AUNT JEMIMA PICTURE | REG. NO.: ( 120,159) GRANTED: 1/15/18 |

-3-

| | |
|---|---|
| MISCELLANEOUS DESIGN<br>AUNT JEMIMA PICTURE | REG. NO.:(523,168)<br>GRANTED: 3/28/50 |
| MISCELLANEOUS DESIGN<br>AUNT JEMIMA PICTURE | REG. NO.:(866,533)<br>GRANTED: 3/11/69 |
| MISCELLANEOUS DESIGN<br>AUNT JEMIMA PICTURE | REG. NO.:(1,614,072)<br>GRANTED: 9/18/90 |

Aunt Jemima is a fanciful name and does not refer to any known living individual.

The stippling in the mark is used to indicate shading.

Applicant hereby appoints Janet L. Silverberg and Jacqueline A. Leimer, attorneys at law, to prosecute this application to register, to transact all business in the Patent and Trademark Office in connection therewith, and to receive the certificate of registration.

R. Thomas Howell, Jr. states that he is Vice President and General Corporate Counsel of applicant corporation and is authorized to execute this instrument on behalf of said corporation; being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any registration resulting therefrom, declares that he believes said corporation to be the owner of the trademark sought to be registered; that to the best of his knowledge and belief no other person, firm, corporation or association has the right to use said mark in commerce, either in the identical form or in such near resemblance thereto as to be likely, when applied to the goods of such other person, to cause confusion, or to cause mistake, or to deceive; and that the facts set forth in this application are true and, that all statements made of his own knowledge are true and that all statements made on information and belief are believed to be true.

THE QUAKER OATS COMPANY

By: _____
R. Thomas Howell, Jr.
Vice President and General
Corporate Counsel

Date: June 25, F.91



74/180630



MAIL ROOM
80 JUN 28 1991
PAT. & TRADEMARK OFF.

**APPLICANT:** THE QUAKER OATS COMPANY

**ADDRESS:** Quaker Tower
321 North Clark Street
Chicago, Illinois 60610

**DATE OF FIRST USE**
**IN COMMERCE:** At least as early as
October 1, 1989

**DATE OF FIRST USE IN**
**INTERSTATE COMMERCE:** At least as early as
October 1, 1989

**GOODS:**

PANCAKE AND WAFFLE MIX; GRITS; WHEAT FLOUR; PREPARED BAKING
MIXES AND BATTER FOR MAKING CAKES, BREADS AND MUFFINS;
FROZEN PANCAKE BATTER; TABLE SYRUP; CORN MEAL; FROZEN
BREAKFAST FOODS, NAMELY WAFFLES, PANCAKES, AND FRENCH TOAST;
AND BAKERY GOODS in International Class 30

**ATTORNEY:** Janet L. Silverberg
Attorney for Applicant
The Quaker Oats Company
Suite 25-5
Quaker Tower
321 North Clark Street
Chicago, Illinois 60610
Telephone: (312) 222-7406

**MARK:**

INT.CL
30
PRIOR US CL
46



Page 1 of 1

| ORDER NUMBER | | | 1955365 |
|---|---|---|---|
| REFERENCE ORDER NUMBER | | | 0 |
| BIN NUMBER | | | 0 |
| DELIVERY INSTRUCTIONS | | | |

| ORDER DATE/TIME | PALM NUMBER | CUSTOMER NUMBER | CONTACT PHONE NUMBER | PAYMENT METHOD | TOTAL COST OF ORDER |
|---|---|---|---|---|---|
| 2014/08/05 03:47:00 | | IDON959845 | | CREDIT CARD | $ 15.00 |

**BROADCAST MESSAGE**

**ORDER INFORMATION**

| ORDER LINE | PRODUCT TYPE | DOCUMENT IDENTIFIER | COPIES | STATUS | CUSTOMER REFERENCE |
|---|---|---|---|---|---|
| 1 | BB1 | 74180630 | 1 | FILLED | |

| E-MAIL | |
|---|---|
| FAX NUMBER | |

| CARRIER | |
|---|---|
| CARRIER TRACKING NUMBER | |
| CARRIER ACCOUNT NUMBER | |

Organization
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA. 22313-1450
If Undeliverable Return in Ten Day

OFFICIAL BUSINESS
PENALTY FOR PRIVATE USE, $300

AN EQUAL OPPORTUNITY EMPLOYER

FROM: Mail Stop Document Services
Director of the U.S. Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

TO: DANNEZ WESTBROOK HUNTER
1275 LINCOLN
SUITE 1
ST. PAUL, MN 55105
USA

Exh. 50

Exh. 50

# CERTIFICATE OF SERVICE

**FOR THE COUNTY OF**    ]
**RAMSEY IN THE**    ]ss.     **Case No.:**    **14-CV-6011**
**STATE OF MINNESOTA**    ]

I, _D. W. H._ , HEREBY certify that I am over the age of 18 years old, and located at _12 75 Lincoln Ave Ste 1, 5+ Pav/_ I certify that I have placed a prepaid postage, true and complete original to the court and copies to the party(is) of record in the U.S. Postal Office located at Post Office on the date of August    2014, for this action of the following:

**AMENDED CIVIL COMPLAINT + SUMMONS + AFFIDAVIT OF LARNELL EVANS SR. + MOTION FOR RULE 11 SANCTIONS EXHIBITS**
**+ Exhs. 1 through 50**

| | |
|---|---|
| c/o Agent: CT Corporation System<br>**PepsiCo, Inc.**<br>208 S. LaSalle St.<br>Ste #814<br>Chicago, IL 60604<br>700 Anderson Hill Road Purchase,<br>N.Y. NY 10577 ;<br>555 West Monroe Street,<br>Chicago, IL 60661,<br>(Ph): (914) 253-2000,<br>Fax Number: (914) 253-2070 | c/o Agent: CT Corporation System<br>**Pinnacle Foods Group, LLC**<br>208 So. LaSalle St,<br>Ste # 814<br>Chicago, IL 60604<br>and a Principal place of business 99<br>Jefferson Road, Parsippany, NJ 07054. |
| c/o Agent: CT Corporation System<br>**The Quaker Oats Company**<br>208 So. LaSalle St.<br>Suite 814<br>Chicago, IL 60604<br>555 W Monroe St. Fl. #1<br>Chicago, Illinois 60661-3716 | **c/o Clerk**<br>United States District Court<br>Northern District of Illinois<br>Everett McKinley Dirksen<br>United States Courthouse<br>219 South Dearborn Street<br>Chicago, IL 60604 |
| c/o Agent: CT Corporation System<br>**The Hillshire Brands Company**<br>208 So. LaSalle St, Ste# 814<br>Chicago, IL 60604<br>**c/o Secretary: Kent B. Magill**<br>400 S Jefferson St.<br>Chicago, IL 60607. | **c/o Janet Lynn Silverberg**<br>PepsiCo, Inc.<br>555 W. Monroe St.<br>Suite 11-10,<br>Chicago, IL 60661-3605. |

I declare under the penalty of perjury under the laws of the State of Minnesota and/or N. Carolina that the above is true and correct.

Date: **09/04/14**

Respectfully Submitted,

_D. W. Hanter_